77 P.3d 83

Jennifer L. TROYER, formerly known as Jennifer L. Decker, Plaintiff–Appellee,

v.

Carl W. ADAMS, M.D., Defendant–Appellant,

and

John Bellatti, M.D., and Patricia Bailey, M.D., Defendants–Appellees.

No. 25174.

Supreme Court of Hawai'i.

Sept. 25, 2003.

Ellen Godbey Carson (Ellen Godbey Carson and Larisa L. Heroldt of Alston Hunt Floyd & Ing, on the brief), Honolulu, for the defendant-appellant, Carl W. Adams, M.D.

Stuart M. Kodish (Ian L. Mattoch, Stuart M. Kodish, and Ian Scott Mattoch, of the Law Offices of Ian L. Mattoch, on the brief),

Honolulu, for the plaintiff-appellee, Jennifer L. Troyer, formerly known as Jennifer L. Decker.

J. Richard Peterson, Hilo, for the defendant-appellee, John Bellatti, M.D.

Kathy K. Higham (Elton John Bain and Kathy K. Higham of Kessner Duca Umebayashi Bain & Matsunaga, on the brief), Honolulu, for the defendant-appellee, Patricia Bailey, M.D.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., Dissenting.

Opinion of the Court by LEVINSON, J.

■ The defendant-appellant Carl W. Adams, M.D., appeals from the order of the third circuit court, the Honorable Ronald Ibarra presiding, granting the petition of the plaintiff-appellee Jennifer L. Troyer, formerly known as Jennifer L. Decker, for issuance of order determining good faith settlement, pursuant to Act 300 (2001),[1] with the defen-

---

1. Act 300 promulgated HRS § 663–15.5 (Supp. 2002), which provides in relevant part:

 (a) A release, dismissal with or without prejudice, or a covenant not to sue or not to enforce a judgment that is given in good faith under subsection (b) to one or more joint tortfeasors, or to one or more co-obligors who are mutually subject to contribution rights, shall:

 (1) Not discharge any other party not released from liability unless its terms so provide;

 (2) Reduce the claims against the other party not released in the amount stipulated by the release, dismissal, or covenant, or in the amount of the consideration paid for it, whichever is greater; and

 (3) Discharge the party to whom it is given from all liability for any contribution to any other party.

 This subsection shall not apply to co-obligors who have expressly agreed in writing to an apportionment of liability for losses or claims among themselves.

 (b) For purposes of subsection (a), a party shall petition the court for a hearing on the issue of good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors or co-obligors, serving notice to all other known joint tortfeasors or co-obligors....

 The petition shall indicate the settling parties and the basis, terms, and settlement amount. .... [A] nonsettling party may file an objection to contest the good faith of the settlement.... The party asserting a lack of good

faith shall have the burden of proof on that issue.

 . . . .

 (c) The court may determine the issue of good faith for purposes of subsection (a) on the basis of affidavits or declarations served with the petition under subsection (a), and any affidavits or declarations filed in response. In the alternative, the court, in its discretion, may receive other evidence at a hearing.

 . . . .

 (e) A party aggrieved by a court determination on the issue of good faith may appeal the determination. The appeal shall be filed within twenty days after service of written notice of the determination, or within any additional time not exceeding twenty days as the court may allow.

 . . . .

 (h) This section shall not apply to a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment given to a co-obligor on an alleged contract debt where the contract was made prior to January 1, 2002.

 In 2003, the legislature amended HRS § 663–15.5(a) and (b), see 2003 Haw. Sess. L. Act 146, § 1, but the only change that is relevant for present purposes is the substitution of the term "joint tortfeasor or co-obligor" for "party" in HRS § 663–15.5(a) and the amendment of HRS § 663–15.5(b) in various respects to conform to the foregoing change.

 "The term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for

dants-appellees John Bellatti, M.D., and Patricia Bailey, M.D. Dr. Adams argues that the circuit court erred in granting the petition on the bases that: (1) Act 300 does not apply to the present matter, because Troyer's claims arose out of a contract entered into prior to January 1, 2002, and Act 300, § 6(1) states that the Act shall not apply to "claims arising out of a contract made prior to January 1, 2002"; (2) the settlement in the present matter was not given in good faith, because (a) it exposes Dr. Adams to a "grossly disproportionate allocation" of the damages that Troyer seeks, (b) Troyer withheld "essential information" from the circuit court regarding the total damages that she seeks and the opinions of two of her experts regarding the medical care provided to her by Drs. Bailey and Bellatti, and (c) Dr. Adams was deprived of material witnesses and essential testimony related to the Act 300 good faith determination; and (3) Act 300 violates Dr. Adams's right to due process, pursuant to article I, section 5 of the Hawai'i Constitution [2] and the fourteenth amendment to the United States Constitution,[3] *inter alia,* because the statute destroys his cross-claims for contribution against the settling tortfea-

sors and prevents him from collecting from them based on their proportionate share of liability.

The meaning of a settlement "given in good faith" pursuant to HRS § 663-15.5 (Supp.2002), *see supra* note 1, the statute promulgated by Act 300, raises a question of first impression for this court. For the reasons discussed more fully *infra* in section III, we hold that the question of whether a settlement is "given in good faith" for purposes of HRS § 663-15.5 is a matter left to the discretion of the trial court in light of all of the relevant circumstances extant at the time of settlement; thus, absent an abuse of discretion, the trial court's ·determination should not be disturbed. In addition, we hold that (1) Act 300 applies to Troyer's claims of medical malpractice, because they do not arise from contracts, (2) the circuit court did not abuse its discretion in determining that the instant settlement was entered into in good faith, and (3) Dr. Adams's due process rights were not violated in the present matter.

Accordingly, we affirm the order of the third circuit court, filed on June 5, 2002,

---

the same injury to person or property, whether or not judgment has been recovered against all or some of them." HRS § 663-11 (1993).

The definition of "joint tortfeasors" set forth in HRS § 663-11 "is based on liability." *Saranillio v. Silva,* 78 Hawai'i 1, 10, 889 P.2d 685, 694, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995). In this connection, "[t]he basis of liability is not relevant, nor is the relationship among those liable for the tort.... The point is that both [tortfeasors] are (at least) 'severally' liable for the same injury to the plaintiff." *Id.* (some emphasis and brackets added and some in original) (citations and internal quotation signals omitted). And a tortfeasor ... cannot be jointly and/or severally liable with another unless "[t]he person who has been harmed can sue *and recover* from both...." Black's Law Dictionary 914 (6th ed.1990) (emphasis added); *see id.* at 915 (defining "liable" in relevant part to mean "compellable to make ... compensation" and "accountable for or chargeable with").

*Ozaki v. Association of Apartment Owners of Discovery Bay,* 87 Hawai'i 265, 271 n. 5, 954 P.2d 644, 650 n. 5 (1998) (alterations in original).

Joint and several liability for joint tortfeasors as defined in section 663-11 is abolished except in certain circumstances defined in HRS § 663-10.9 (Supp.2002). With respect to the present matter, HRS § 663-10.9(3) provides in relevant

part that joint and several liability is not abolished

 [f]or the recovery of noneconomic damages in actions ... involving injury or death to persons against those tortfeasors whose individual degree of negligence is found to be twenty-five per cent or more under section 663-31. Where a tortfeasor's degree of negligence is less than twenty-five per cent, then the amount recoverable against that tortfeasor for noneconomic damages shall be in direct proportion to the degree of negligence assigned....

In *Doe Parents v. State, Dep't of Educ.,* 100 Hawai'i 34, 87 n. 50, 58 P.3d 545, 598 n. 50 (2002), however, this court noted that the dismissal of a party with prejudice means that the party can no longer be a joint tortfeasor because he or she "cannot be liable in tort to the plaintiffs"; "therefore, HRS § 663-10.9 does not authorize apportionment of liability" in such circumstances.

2. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law...."

3. The fourteenth amendment to the United States Constitution provides in relevant part that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...."

granting Troyer's petition for issuance of an order determining that the instant settlement was given in good faith.

## I. BACKGROUND

### A. Act 300 (2001) And HRS § 663–15.5

HRS § 663–15.5, *see supra* note 1, governs, *inter alia*, the effect of a settlement on non-settling joint tortfeasors in the context of multi-party litigation. It provides that a settlement "given in good faith" shall: (1) not discharge the non-settling joint tortfeasors from liability, unless its terms so provide; but (2) reduce the claims against the non-settling joint tortfeasors in the amount stipulated in the settlement or in the amount of the consideration paid for it, whichever is greater; and (3) discharge the settling tortfeasor from all liability for any contribution to the non-settling joint tortfeasors. HRS § 663–15.5(a). HRS § 663–15.5 also provides for procedures by which a party may petition the court for a hearing on the issue of good faith. In addition, pursuant to HRS § 663–12 (1993),[4] "[a] joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement." On the other hand, HRS § 663–12 provides that a non-settling joint tortfeasor is entitled to contribution from other joint tortfeasors—*i.e.*, other non-settling joint tortfeasors or joint tortfeasors whose settlements with the plaintiff or plaintiffs have not been determined to be in good faith, pursuant to HRS § 663–15.5—for any amount paid in excess of his or her *pro rata* share of liability, to be determined on the basis of his or her relative degree of fault, if "there is such a disproportion of fault . . . as to render inequitable an equal distribution . . . of the common liability." *See supra* note 4.

This court has never had occasion to construe the meaning of "good faith" as that term is employed in HRS § 663–15.5; neither has the legislature expressly defined the term. As discussed more fully *infra* in section III, however, HRS § 663–15.5 is similar to a plethora of statutory acts governing contributions among tortfeasors (CATAs) that are in effect across the country. The courts that have addressed the meaning of a "good faith" settlement for purposes of their own CATAs have generally adopted one of three standards: (1) the "proportionate liability" standard formulated by the California Supreme Court in *Tech–Bilt, Inc. v. Woodward–Clyde & Assocs.*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985), which considers whether the settlement represents a fair assessment of the settling tortfeasors' share of liability at the time of settlement; (2) the "non-collusive" or "non-tortious conduct" standard, which simply examines whether the settlement is collusive, fraudulent, dishonest, or involves tortious conduct, in which case the settlement is deemed to be in bad faith; and (3) the "totality of the circumstances" approach, which grants trial courts the discretion to determine whether a settlement is given in good faith in light of any relevant circumstances, but does not dictate the factors that the trial court must consider. The present matter compels this court to determine which of the three foregoing standards, if any, best achieves the legislature's intent in promulgating Act 300.

### B. Procedural History

On February 2, 2001, Troyer filed a complaint in the third circuit court naming Drs. Bailey, Bellatti, and Adams as defendants [hereinafter, collectively, "the defendants"],

---

4. HRS § 663–12 provides:

> **Right of contribution; accrual; pro rata share.** The right of contribution exists among joint tortfeasors.
>
> A joint tortfeasor is not entitled to a money judgment for contribution until the joint tortfeasor has by payment discharged the common liability or has paid more than the joint tortfeasor's *pro rata* share thereof.
>
> A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement.
>
> When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their *pro rata* shares, subject to section 663–17.

jointly and severally. Troyer alleged that the defendants' negligence (Count I) and failure to obtain her informed consent (Count II) were substantial factors in causing her serious personal injury, including, *inter alia,* the amputation of her right forefoot. Specifically, Troyer alleged that, on or about December 22, 1997, she suffered an injury to her leg when, for unknown reasons, she fell in a parking lot and was transported to the emergency room of Kona Community Hospital (KCH), where she was first treated by Dr. Bailey. Troyer alleged (1) that Dr. Bailey "failed to timely and appropriately evaluate and treat [her] injuries[,]" including the failure properly to assess the "neuro-vascular integrity of [her] injured leg[,]" "to consult radiology to arrange examination of the artery in [her] injured leg with vascular compromise[,]" and "to consult orthopedics or surgery[,]" and (2) that Dr. Bailey's "breach of the standard of care for an emergency room physician engaged in the practice of medicine ... was a substantial factor in causing [her] injury[.]"

Troyer further alleged that, on or about December 22, 1997, while still a patient at KCH, she was examined and treated by Dr. Bellatti, an orthopedic surgeon. Troyer alleged that the unusual fracture pattern of her injury required that Dr. Bellatti consider the possibility of an arterial injury to her leg, which he failed to do in a timely manner. Troyer claimed that Dr. Bellatti's misdiagnosis or delayed diagnosis prevented her immediate transfer to Queen's Medical Center (QMC) in Honolulu for further treatment of her injury. Troyer asserted that the foregoing conduct breached the standard of care for an orthopedic surgeon engaged in the practice of medicine and was a substantial factor in causing further injury to her leg.

Troyer was transported to QMC on December 23, 1997, where she was treated by Dr. Adams, a vascular surgeon. Troyer alleged that the surgical operation or operations performed by Dr. Adams did not conform to the appropriate standard of care. Specifically, she alleged that Dr. Adams constructed a bypass graft of a "small distal posterior tibial artery" using "natural/artificial vein composite conduit," which was "longer than necessary and ... also oversized for the runoff artery." Consequently, according to Troyer, the bypass graft eventually failed, "causing a thromboembolism and resulting in the loss (amputation) of [her] right forefoot."

Troyer further alleged (1) that the defendants had not "fully informed her of all of the possible risks, contraindications, and alternatives to the course of treatment/non-treatment which [the d]efendants took" and (2) that she "would have sought further evaluation and/or treatment if she had received proper information from [d]efendants."

Finally, Troyer alleged that the defendants' conduct caused "serious injury to [her], including past and future special and general damages, serious emotional distress, and permanent disability and injury, in an amount to be determined at trial."

On February 21, March 12, and March 15, 2001, Drs. Bellatti, Bailey, and Adams, respectively, filed answers to Troyer's complaint, in which each admitted treating Troyer but denied that he or she was negligent or that he or she had failed to inform Troyer fully regarding her medical treatment and contended that any injuries or damages that she sustained were unavoidable or caused by superseding/intervening causes or accidents beyond each physician's control. In their answers, each defendant also asserted cross-claims against his or her codefendants for contribution and/or indemnification.

Discovery ensued, and the circuit court set a trial date of May 28, 2002. Troyer subsequently moved to continue the trial date, however, because her medical condition had not stabilized, and, on April 8, 2002, the circuit court granted the motion and set a new trial date for February 4, 2003. The circuit court ordered that all discovery be completed by December 16, 2002.

In the course of discovery, Troyer reached a settlement agreement with Drs. Bailey and Bellatti, in which Dr. Bailey agreed to pay $15,000.00 and Dr. Bellatti agreed to pay $50,000.00 in order to settle Troyer's claims. Accordingly, on April 16, 2002, Troyer petitioned the circuit court for an order determining that her settlement with Drs. Bailey

and Bellatti was given in good faith, pursuant to HRS § 663–15.5, *see supra* note 1, and, consequently, barred "any other alleged joint tortfeasor from asserting any claims against defendants Bellatti and Bailey for contribution and/or indemnity based on comparative fault, common law indemnity and/or joint obligation."[5]

In her petition, Troyer alleged, *inter alia,* as follows:

Disputes exist as to both liability and damages. Plaintiff has believed and continues to believe that the vast majority of negligence and malpractice in this matter rests with [Dr. Adams]. Plaintiff does have negligence claims against Dr. Bellatti and Dr. Bailey. However, the value of those claims is very small compared to the claim against Dr. Adams. Plaintiff determined that a $50,000 settlement with [Dr.] Bellatti and a $15,000 settlement with [Dr.] Bailey would be acceptable and appropriate in this case.

Troyer cited the expert opinion of Marc A. Levine, M.D., in support of her belief that Dr. Adams was the principal party at fault for her injury, and attached Dr. Levine's May 19, 2000 report—which was based on his review of the medical files pertaining to Troyer's injury—to her petition. In his report, Dr. Levine related that when Troyer arrived at QMC, her examiners noted "some signs of ischemia of her right foot, but none of [acute,] 'critical ischemia[,]'" which, according to Dr. Levine, "constitutes a loss of circulation so profound that in the absence of very prompt, appropriate intervention, major amputation is virtually inevitable." Dr. Levine opined that "acute, critical ischemia results from an injury to the popliteal artery, which is a known potential complication of fractures of the tibial plateau[,]" but that "[s]ome patients ... possess sufficient collateral circulation around the occluded artery so as to maintain viability of the affected limb"; Dr. Levine believed this "to have been the case with [Troyer]." Because Troyer's foot and

lower leg were not "critically ishemic following the injury," Dr. Levine did not believe that "a revascularization was urgent."

Furthermore, Dr. Levine believed that Dr. Adams's first operation on Troyer's foot, performed on December 23, 1997, "did not treat the arterial injury that had caused the clot to form in the first place" and explained that, "[a]bsent treatment of the injury, [the] clot will reform." In Dr. Levine's opinion, Dr. Adams's first operation on Troyer "would have been predicted to serve no positive purpose" and "would predicably result in inflammation and scarring that would make this segment more difficult to expose at a later date."

But Dr. Levine focused his primary criticism of Dr. Adams on the second operation that he performed on Troyer's injured foot on January 2, 1998 and which, for several reasons, Dr. Levine considered to fall below the appropriate standard of care. According to Dr. Levine,

[Dr. Adams] used a 6 mm.-diameter Impragraft/saphenous vein composite conduit to a small distal posterior tibial artery. Vein graft bypasses to tibial arteries have a high patency rate, even in patients with arteriorsclerosis, which in turn results in failure of significant numbers of bypass grafts in long-term survivors. [Troyer] does not fall into this category of patients. A graft such as Dr. Adams used would predictably have a very low patency rate, for a variety of reasons: 1) Synthetic grafts have less resistence to thrombosis than vein grafts, the inner lining of which is biologically-adapted to resist thrombosis[;] 2) A small tibial artery will probably have a relatively limited capacity to accept flow. This will result in a relatively slow flow rate in any bypass graft. Bypass grafts with slow flow rates are more prone to thrombosis. Blood which is not moving rapidly tends to clot. This would be particularly true for a 6 mm.-diameter syn-

---

5. Troyer's petition for an order determining good faith settlement and Dr. Adams's memorandum in opposition to the petition, discussed *infra,* were sealed pursuant to orders filed by the circuit court on April 17, 2002 and May 2, 2002, respectively. Because it is necessary to consider the contents of these filings in order to determine whether the settlement was entered into in good faith, however, we vacate the circuit court's orders solely for purposes of rendering this opinion.

thetic graft, the runoff of which is a 2 mm. tibial artery [; and] 3) Over time, patients tend to develop areas of stenosis at the splice point between the synthetic and vein graft, and these in turn result in graft failure.

Dr. Adams's bypass graft was also quite long, coursing from the common femoral artery in the groin ... to the posterior tibial artery above the ankle. . . . Exactly why Dr. Adams elected to construct such a long bypass graft, when a vein graft from just above the knee would have sufficed, is unclear. . . . The text of [his] report does not refer to any attempt to perform an appropriate-length bypass with vein. The long composite graft appears to have been the initial plan.

The ischemia and subsequent loss of [Troyer's] right forefoot does appear to have been a result of thromboembolism. Given the above scenario, within reasonable medical probability the thromboembolism (or thromboemboli) formed as a result of relatively stagnant flow in a long synthetic graft, which was also oversized for the runoff artery. Had Dr. Adams performed no revascularization attempt at all on [Troyer], it appears likely that she would not have lost her forefoot.

Finally, Dr. Levine predicted that, if Troyer's "partial foot amputation stump cannot heal, it appears likely that at some point in time, she will best be served by a below-knee amputation."

In her petition, Troyer pointed out (1) that Dr. Adams had testified during his deposition that he had no criticism of the care rendered by either Dr. Bailey or Dr. Bellatti and (2) that Dr. Adams's retained expert witness, Lewis Schwartz, M.D., testified during his deposition that he did not intend to offer any opinion criticizing the treatment of Dr. Bai-

ley or Dr. Bellatti. Troyer attached the transcripts of the depositions of Dr. Adams and Dr. Schwartz to her petition along with Dr. Levine's report.

On May 2, 2002, Dr. Adams filed a memorandum in opposition to Troyer's petition. First, Dr. Adams contended that Act 300, the legislation that promulgated HRS § 663-15.5, did not apply to the settlement because the case arose from contracts entered into prior to January 1, 2002, and, consequently, fell within an express exception to Act 300.[6] Second, Dr. Adams argued that even if Act 300 applied, the settlement was not given in good faith because (a) Troyer had failed to disclose information essential to an accurate assessment as to whether the proposed settlement was a good faith one, including, *inter alia*, a rough approximation of her likely total recovery, the settling-tortfeasors' proportionate liability, and "admissions" by herself and her expert witnesses that Drs. Bailey and Bellatti were negligent, and (b) Troyer had failed to comply with the circuit court's order that she permit Dr. Adams to depose the expert witnesses that she had retained to testify regarding the treatment by Drs. Bailey and Bellatti.[7]

Dr. Adams attached an affidavit of his counsel attesting that Troyer's counsel had informed her that Troyer was seeking "policy limits" against Dr. Adams and "confirmed that this meant $1,000,000 or more[.]" Dr. Adams pointed out that, if Troyer was permitted to settle her claims against Dr. Bailey and Dr. Bellatti for $15,000 and $50,000, respectively, Dr. Adams would potentially be liable for more than ninety percent of the damages that she sought. Dr. Adams also attached, *inter alia*, Troyer's pretrial statement, in which she alleged that Drs. Bailey and Bellatti were negligent, and the expert

---

6. Act 300, § 6 provides:

This Act shall apply to:

(1) Any release, dismissal, or covenant given after this Act takes effect, regardless of the date of the occurrence of the underlying claim, *except for claims arising out of a contract made prior to January 1, 2002;* and

(2) Contract claims where the contract was made on or after January 1, 2002.

2001 Haw. Sess. L. Act 300, § 6 at 877 (emphasis added).

7. Dr. Adams was apparently referring to the circuit court's order granting Troyer's motion to continue trial because she was not medically stable, in which the circuit court directed, *inter alia,* that "[a]ll discovery shall be completed by December 6, 2002." Obviously, Troyer could not have been in violation of this aspect of the order on May 2, 2002.

witness reports submitted to Troyer by Joseph R. Yates, M.D., and Lance D. Weaver, M.D., regarding Drs. Bailey's and Bellatti's treatment.[8]

Moreover, Dr. Adams argued that Dr. Levine's report regarding his own treatment of Troyer was not admissible evidence regarding good faith because it was not sworn and Troyer had not produced Dr. Levine for deposition.[9]

Finally, Dr. Adams acknowledged that neither he nor his experts had alleged that Drs. Bailey or Bellatti were negligent but noted that he had listed Troyer's expert witnesses—Drs. Yates and Weaver—on his final witness list, filed on February 27, 2002, and had sought, unsuccessfully, to depose them.

On the same day that he filed his memorandum in opposition to Troyer's petition, Dr. Adams also filed a motion for discovery orders and sanctions, in which he alleged that Troyer had failed to produce Drs. Yates, Weaver, and Levine for depositions. Dr. Adams prayed that the circuit court, *inter alia,* (1) order the production of the experts for deposition and (2) prohibit Troyer from introducing evidence of the testimony or opinions of Drs. Yates and Weaver at trial, "except to rebut any evidence introduced by Dr. Adams as to their respective opinions and testimony in this case."

On May 14 and 15, 2002, Drs. Bellatti and Bailey, respectively, filed memoranda in support of Troyer's petition. Each contended that his or her treatment of Troyer was appropriate and that Troyer had a viable foot until shortly after the bypass procedure performed by Dr. Adams on January 2, 1998. Dr. Bellatti submitted, *inter alia,* a report by his own expert witness, Graham A. Purcell, M.D., concluding that Dr. Bellatti's treatment of Troyer "during the time that she was at [KCH] was appropriate and well within the standard of care." Dr. Bailey pointed out that Dr. Adams testified in his deposition that neither Dr. Bailey nor Dr. Bellatti were

8. Dr. Yates, Troyer's proposed expert in the field of emergency medical care, opined in his report that Dr. Bailey's treatment of Troyer deviated from the appropriate standard of care in the following ways:
 1. Dr. Bailey failed to rush the patient through the initial testing and evaluation of her injuries to reduce the total amount of time from identification of limb-threatening injury to definitive treatment. The time from arrival to orthopedic evaluation of a limb-threatening condition was approximately five hours.
 2. Dr. Bailey failed to reassess the neurovascular integrity of a severely-injured limb even once since the original examination of the patient....
 3. Dr. Bailey failed to consult radiology to arrange examination of the artery in an injured limb with vascular compromise.
 4. Dr. Bailey failed to consult orthopedics or surgery for the injured limb with vascular compromise.
 Dr. Yates further opined that
 a prompt identification of the arterial injury and a prompt decompression followed by early transfer for definitive treatment would have salvaged the entire lower extremity for [Troyer]. By failing to properly evaluate and re-evaluate [Troyer's] injuries and by failing to consult the appropriate specialists sooner, Dr. Bailey deprived [Troyer] of the reasonably certain salvage of her limb in its entirety.
 Dr. Weaver, Troyer's proposed expert in the field of orthopedic surgery, criticized Dr. Bellatti's care in his report on the basis that "Dr. Bellatti never considered a vascular injury as the

proximate cause of the numbness and coolness to [Troyer's] toes and foot[.]" Dr. Weaver opined that,
> [w]ith such a significant fracture and admitted unusual fracture pattern, an arterial injury should have been considered and an attempted diagnosis made. That would have included an arteriogram and an evaluation by a vascular surgeon. It is my understanding that there was no vascular surgeon at this hospital or on the island, and that the hospital did not have the capability to do an arteriogram. In my opinion, at that point with no pulse present after the compartment have been released, the patient should have been transferred immediately for further evaluation at [QMC] which was the closest hospital.
>
> ...
>
> ... Immediately means without doing the compartment syndrome and let all of the procedures occur at [QMC] so there was no delay or after the compartment release was done.... In my opinion, Dr. Bellatti never considered the possibility of vascular injury until approximately 18 or 19 hours after the surgery was over. Only then did he transfer the patient to [QMC].

9. By contrast, Dr. Adams contended that the reports of Drs. Yates and Weaver were admissible pursuant to Hawaiʻi Rules of Evidence (HRE) Rule 802.1(a)(B), as statements against interest that were adopted by Troyer, although he did not explain why their reports were statements against Troyer's interest.

negligent in their treatment of Troyer. Both doctors submitted a transcript of the deposition of Lewis Schwartz, M.D., Dr. Adams's own expert witness, in which Dr. Schwartz opined that "in this case, the severity of the injury was such that this outcome was a foregone conclusion." Finally, Dr. Bailey contended that Act 300 applied to the present matter, inasmuch as it was a straightforward medical malpractice case.

On May 15, 2002, Troyer filed a reply memorandum in support of her petition, in which she indicated that her decision to settle with Drs. Bailey and Bellatti was influenced by the administrative proceedings before the Medical Claims Conciliation Panel (MCCP), in which she had participated. These proceedings "involved all of the same parties and all of the same expert witnesses.... Only Dr. Bellatti and Dr. Bailey were completely cleared by the Panel, whereas, Dr. Adams'[s] treatment was questioned." Troyer attached the decision of the MCCP, dated December 5, 2000, which found that Dr. Bailey and Dr. Bellatti "were not actionably negligent in the care and treatment of [Troyer,]" but "question[ed Dr. Adams's] choice of treatment. However, the panel did not find sufficient evidence to prove actionable negligence."

On May 23, 2002, the circuit court, the Honorable Ronald Ibarra presiding, conducted a hearing on Troyer's petition and Dr. Adams's motion for discovery orders and sanctions. Troyer argued that Dr. Adams had presented no evidence of (1) collusion or any improper purpose behind the settlement or (2) negligence on the part of Drs. Bailey or Bellatti. As for her own witnesses who had testified that Drs. Bailey and Bellatti were negligent, Troyer contended that their opinions were "counterbalanced" by the experts retained by Drs. Bailey and Bellatti, who had exonerated them, and, in any event, that Dr. Adams had no right to rely on the expert opinions of Troyer's experts. In light of all the expert opinions, Troyer had concluded that the negligence of Drs. Bailey and Bellatti was minimal and that she had settled with them in order to "streamline" the case, "cut expenses," and "be able to work it in a more efficient manner."

Dr. Adams contended that the settlement was not a case of collusive bad faith between the settling defendants and the plaintiff but, rather, a case of bad faith by Troyer in violating the court's order regarding discovery. Specifically, Dr. Adams pointed to Troyer's failure to produce Drs. Yates and Weaver for depositions. Dr. Adams essentially argued that, because these two witnesses had indicated negligence on the parts of Drs. Bailey and Bellatti, he should be permitted to depose them in order to determine whether the settlements reflected their proportionate shares of liability to Troyer. Dr. Adams justified his lack of evidence regarding his cross-claims by declaring that "the plaintiff had agreed that those experts would be made available and we had named them, so I have not named independent people to prove up the cross-claim regarding proportionate liability of the other defendants." Dr. Adams also contended that Troyer violated HRS § 671–16 (1993) by submitting the MCCP decision as an exhibit attached to her reply memorandum. Dr. Adams asked the court to strike any evidence relating to the proceedings before the MCCP and asserted that, when that was struck, "the only thing that's left is deposition testimony, all of which shows that there is no evidence at all on this record against Dr. Adams."

Dr. Bailey argued that the settlement amounts were not unreasonable because "this is a no liability case." "It's the nature of the injury that determined this result, your Honor, not the treatment that she got by any of the physicians in this case." When the circuit court inquired regarding the admissible evidence in the record that the court could consider in determining whether the settlement was given in good faith, Dr. Bailey responded that the court could look to the testimony of Dr. Bellatti, who testified that Dr. Bailey was not at fault, and "the sworn testimony of Dr. Adams, who likewise testified that Dr. Bailey gave [Troyer] fine medical treatment." Finally, Dr. Bailey argued that Act 300 governed Troyer's petition because, when the exception set forth in Act 300, § 6(1), *see supra* note 6, was read in the context of the entire act, it was clear that only contracts involving "co-obligors" were

excepted from the law because "separate and independent contracts that have no co-obligation among the defendants would, by operation of law, not allow obligations of equitable contribution or indemnity."

Dr. Bellatti also contended that Dr. Adams had produced no evidence that the settlement was given in bad faith and pointed out that, to the contrary, Dr. Adams and his expert, Dr. Schwartz, had not found fault with Dr. Bellatti's care. Dr. Bellatti argued that Dr. Adams should have retained his own expert witnesses to support his cross-claims.

The circuit court took the matter under advisement and, on June 5, 2002, issued orders (1) granting Troyer's petition for issuance of an order determining good faith settlement and (2) denying Dr. Adams's motion for discovery orders and sanctions. On June 19, 2002, Dr. Adams filed a timely notice of appeal from the order granting Troyer's petition pursuant to HRS §§ 641-1 and 663-15.5(e), *see supra* note 1, and Hawai'i Rules of Appellate Procedure (HRAP) Rules 3 and 4. On June 20, 2002, Dr. Adams filed a motion to stay the proceedings pending appeal and to allow an interlocutory appeal of the circuit court's June 5, 2002 order denying his motion for discovery orders and sanctions.

On August 13, 2002, the circuit court partially granted Dr. Adams's motion for a stay of the proceedings, ordering that the proceedings be stayed for one year, but denied his motion for leave to file an interlocutory appeal of the circuit court's order denying his motion for discovery orders and sanctions, filed on June 4, 2002.

## II. STANDARD OF REVIEW

### A. Statutory Interpretation

■ We review the circuit court's interpretation of a statute *de novo*. *State v. Pacheco*, 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute

itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1-15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

> . . . This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1-15(2) (1993).

*Id.* at 94–95, 26 P.3d at 583–84 (some citations and internal quotation marks added and some in original) (brackets in original).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002).

### B. Constitutional Law

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citation and some internal quotation signals omitted).

### C. Findings Of Fact And Conclusions Of Law

■ This court reviews the [circuit] court's conclusions of law (COLs) *de novo* under the right/wrong standard. *Child Support Enforcement Agency v. Roe,* 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001). "Under this . . . standard, we examine the facts and answer the question without being required to give any weight to the trial

court's answer to it.... Thus, a [COL] is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998).

*State v. Entrekin*, 98 Hawai'i 221, 225, 47 P.3d 336, 340 (2002) (some brackets in original and some added).

 On the other hand,

The [circuit] court's [findings of fact (]FOFs[)] are reviewed on appeal under the "clearly erroneous" standard. [*In re Jane Doe, Born on May 22, 1976*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996)] (citing *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace*, 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996)); *see also State v. Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

*In re Jane Doe, Born on June 16, 1994*, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003).

## III. *DISCUSSION*

### A. *Act 300 Governs The Settlement.*

 Dr. Adams argues, notwithstanding that Troyer's complaint pleads "medical negligence" and "lack of informed consent," that Troyer's claims "arise[ ] out of contracts for medical care entered into by [Troyer] from December 1997 to January 1998"—*i.e.*, the various consents that Troyer signed in order to obtain medical treatment for her injury— and, consequently, that Act 300 does not govern the subject matter of her settlements with Drs. Bailey and Bellatti, by virtue of the language of Act 300, § 6(1), *see supra* note 6.[10] In support of his statutory interpretation, Dr. Adams contends that, in *Francis v. Lee*, 89 Hawai'i 234, 971 P.2d 707 (1999), *Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawai'i 120, 920 P.2d 334 (1996), and *Leong v. Kaiser Foundation Hospitals*, 71 Haw. 240, 788 P.2d 164 (1990), "Hawai'i [c]ourts have recognized the special nature of medical torts as having a contractual basis" and that "[o]ther courts have similarly recognized medical torts as arising out of the underlying contract."

Troyer counters (1) that HRS § 663–15.5(h), *see supra* note 1, "supercedes the mandate of Act 300[,] § 6," *see supra* note 6, and that the present matter does not "meet the preclusion criteria of HRS § 663–15.5(h)," because it does not involve co-obligors to a contract, and (2) that even if Act 300, § 6 were deemed controlling, Troyer's claims do not arise out of a contract because (a) Troyer's complaint pleads medical negligence and lack of informed consent, which are "medical torts" within the meaning of HRS § 671–1(2) (1993),[11] and (b) "[t]he nature of [a] right or claim is determined from the allegations contained in the pleadings."

Furthermore, Troyer argues that *Francis* and *Leong* are unhelpful to Dr. Adams, inasmuch as *Francis*, 89 Hawai'i at 240, 971 P.2d at 713, merely notes that "medical malpractice cases grow[ ] out of relationships and duties that originate in contract[,]" and *Leong*, 71 Haw. at 243, 788 P.2d at 166, holds

**10.** If Act 300 did not apply to the present matter, then the settlements and Dr. Adams's cross-claim for contribution would be governed by HRS § 663–15 (1993), which provides:

A release by the injured person of one joint tortfeasor does not relieve the joint tortfeasor from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasors to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the *pro rata* share of the released tortfeasors, of the injured person's damages recoverable against all the other tortfeasors.

**11.** HRS § 671–1(2) provides in relevant part that " '[m]edical tort' means professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient."

that a plaintiff does not have a right to a jury trial when the plaintiff has waived that right by means of an agreement to arbitrate any claims for damages arising out of services provided under contract. Troyer points out that her consents to medical treatment did not address what the parties were to do in the event of medical malpractice.

Drs. Bailey and Bellatti concur with Troyer's assertion that her claims "sound in 'medical tort,' " pursuant to HRS § 671–1(2) and, therefore, that HRS § 663–15.5(h) does not exclude the present matter from the purview of Act 300. Neither Dr. Bailey nor Dr. Bellatti address the language of Act 300, § 6(1), upon which Dr. Adams relies, although Dr. Bellatti contends that "Dr. Adams is making a huge stretch in trying to make this medical tort case into a contract case."

None of the parties actually assert that the settlement in the present matter involves "co-obligors" on "an alleged contract debt." Thus, the sole questions presented on appeal regarding the applicability of HRS § 663–15.5 are (1) whether HRS § 663–15.5(h) "supercedes" Act 300, § 6 and (2) if not, whether Troyer's claims "arise[ ] out of a contract made prior to January 1, 2002" for purposes of Act 300, § 6(1).

Pursuant to the plain language of Act 300, § 6(1), see supra note 6, and HRS § 663–15.5(h), see supra note 1, Troyer's argument that HRS § 663–15.5(h) "supercedes" Act 300, § 6, or, put differently, that "claims arising out of a contract," as set forth in Act 300, § 6, should be interpreted in light of HRS § 663–15.5(h) to mean claims among co-obligors on an alleged contract debt, is compelling. As Dr. Bailey's counsel argued in the May 23, 2002 hearing conducted by the circuit court, discussed supra in section I, it is only necessary to exclude releases, dismissals, and covenants not to sue or not to enforce a judgment "given to a co-obligor on an alleged contract debt" from the good faith settlement provisions set forth in HRS

§ 663–15.5, because "separate and independent contracts that have no co-obligation among the defendants would, by operation of law, not allow obligations of equitable contribution or indemnity" under any circumstances. In other words, the only contracts that are governed by HRS § 663–15.5 are contracts involving co-obligors, because they are the only types of contracts that implicate contribution and indemnification rights.[12] Accordingly, it would make no sense for the legislature to have excluded anything other than certain contracts involving co-obligors from the purview of the Act.

In any event, Troyer's claims do not "arise[ ] out of a contract made prior to January 1, 2002."

The question of how to determine the nature of an action has arisen in other contexts. For example, in deciding which statute of limitation applies to an action we said that "[t]he nature of the right or claim is determined from the allegations contained in the pleadings." *Au v. Au*, 63 Haw. [210,] 214, 626 P.2d [173,] 177 [ (1981) ].

> As a general proposition, the character of an action is determined from the facts stated in, and the issues raised by, the plaintiff's complaint, declaration, or petition. It is determined from the substance of the entire pleading, the nature of the grievance, and the relief sought, rather than from the formal language employed or the form of the pleadings.

*Schulz v. Honsador, Inc.*, 67 Haw. 433, 436, 690 P.2d 279, 282 (1984) (citation omitted), *overruled on other grounds, Blair v. Ing*, 96 Hawai'i 327, 331 n. 6, 31 P.3d 184, 188 n. 6 (2001).

As discussed *supra* in section I, Troyer's complaint alleged that the defendants were negligent (Count I) and failed to obtain her informed consent (Count II) with respect to their medical treatment of her injury; the complaint simply does not allege any breach of contract. The settling parties correctly

---

**12.** Indeed, the House Committee on the Judiciary and Hawaiian Affairs stated that the bill that eventually became Act 300 established "a good faith settlement procedure for joint tortfeasors and *co-obligors*," Hse. Stand. Comm. Rep. No.

1230, in 2001 House Journal, at 1599 (emphasis added), suggesting that the legislature understood that Act 300 could only pertain to contracts involving co-obligors.

note that HRS § 671-1(2) defines "medical tort" to mean "professional negligence, the rendering of professional services without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient." Thus, it is clear that the present matter involves a medical malpractice claim rather than a contract dispute.

Dr. Adams does not disagree, as such, with the foregoing conclusion but contends, nevertheless, that a medical malpractice claim may arise out of an underlying contract for the provision of medical care and urges this court to interpret "arising out of," as employed in Act 300, § 6(1), more broadly than "sounding in contract." Thus, he seems to be suggesting that a claim can both sound in tort, *e.g.*, constitute a medical tort pursuant to HRS § 671-1(2), and "aris[e] out of" a contract for purposes of Act 300, § 6(1).[13] Dr. Adams's contention is unpersuasive for a number of reasons.

First, reading Act 300, § 6(1) *in pari materia* with Act 300, § 6(2), *see supra* note 6, which instructs that the Act applies to "[c]ontract claims where the contract was made on or after January 1, 2002," it is reasonable to construe the exclusion of "claims arising out of a contract made prior to January 1, 2002" simply to exclude from the purview of the Act the type of claims that the following subsection includes, the only difference being the date of the underlying contract. Dr. Adams offers no reason why the legislature might have wanted to exclude a broader category of cases from Act 300 pursuant to section 6(1) than it sought to include pursuant to section 6(2), or why this would make any sense.

Second, although there is no legislative history expressly explaining why the legislature wished to exclude claims arising out of contracts made prior to January 1, 2002, there is an obvious explanation—namely, to avoid disrupting the expectations of co-obligors, whose obligations could potentially be impacted by HRS § 663-15.5 and who had entered into or were negotiating a contract when the Act took effect on June 28, 2001. Assuming such a legislative purpose, there would be no reason to exclude anything other than "contract claims" involving co-obligors, arising out of a contract made prior to January 1, 2002, from the purview of the Act. Again, Dr. Adams offers no reason why the legislature might have wanted to exclude a broader category of cases.

Third, the cases that Dr. Adams cites in support of his contention that Troyer's medical malpractice claims "arise out of contracts" for the purposes of Act 300, § 6 are unhelpful to him. In *Francis*, this court overruled *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972), and held that Hawai'i would no longer recognize a claim of tortious breach of contract, but that the state's courts could "still award damages for emotional distress arising out of a breach of contract ... where emotional distress accompanies bodily injury and the action may be regarded as one in tort." 89 Hawai'i at 240, 244, 971 P.2d at 713, 717. This court included "medical malpractice cases growing out of relationships and duties that originate in contract" in this exceptional category and cited *Leong* as an example. *Id.* at 240, 971 P.2d at 713. But this court's holding in *Francis* that certain breaches of contract may give rise to damages for emotional distress hardly supports Dr. Adams's contention that medical malpractice claims "arise out of contracts" within the meaning of Act 300, § 6.[14]

In *Leong*, 71 Haw. at 242-43, 788 P.2d at 166, the plaintiffs appealed an order compel-

13. Moreover, he is asking this court to treat him as a *joint-tortfeasor* for purposes of his cross-claim, while contending that Troyer's claims arise out of *contracts* for the purposes of Act 300, § 6.

14. As we have noted, the primary significance of *Francis* was its repudiation of the rule articulated in *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972), as well as *Chung v. Kaonohi Center Co.*, 62 Haw. 594, 618 P.2d 283 (1980), *i.e.*, that a wanton or reckless breach of contract is actionable in tort, because the rule "unnecessarily blur[red] the distinction between—and undermine[d] the discrete theories of recovery relevant to—tort and contract law." *Francis*, 89 Hawai'i at 235-36, 971 P.2d at 708-09. Thus, it is disingenuous to rely on *Francis* to argue that medical tort claims are, in fact, claims arising out of contract.

ling arbitration of their medical negligence and negligent hiring claims against several parties, notwithstanding a clause in their health plan that required binding arbitration of " 'any claims for damages for personal injury ... arising out of the rendition of or failure to render services under this contract[.]' " (Brackets and ellipses in original.) This court held that the clause was enforceable and affirmed the order compelling arbitration. Noting that "it [was] only under the contract that [plaintiffs] were entitled to and received the medical services from Kaiser," this court pointed out that the plaintiffs could not "pick and choose for their benefit" the provisions of the contract that were retroactive and those that were not. *Id.* None of the parties in the present matter suggest that the forum for the resolution of Troyer's medical tort claims is dictated by any contract.

Finally, *Best Place, Inc.*, 82 Hawai'i at 132, 920 P.2d at 346, held that "there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." Obviously, the fact that a contractual breach may spawn the tort of bad faith does not mean that medical torts "arise out of contracts" for purposes of Act 300, § 6.

The cases from foreign jurisdictions that Dr. Adams cites are no more persuasive. *Toledo v. Kaiser Permanente Medical Group*, 987 F.Supp. 1174 (N.D.Cal.1997), like *Leong*, turned, *inter alia*, on whether an arbitration clause in the plaintiffs' health care contract extended to the plaintiffs' medical malpractice claim. Although the Colorado Supreme Court stated in *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo.1993), that "the relationship that generally underlies the recognition of a duty of care and that consequently gives rise to a physician's liability is contractual in nature[,]" the court expressly held that,

if a physician undertakes to diagnose, treat, or otherwise care for a person, ... at least to the extent of the responsibility undertaken, the examination itself may be said to create a relationship between the parties and impose upon the physician a duty to exercise a level of care that is consistent with his professional training and expertise.

Id. at 536. Thus, *Greenberg* repudiates the notion that the nature of a physician's duty to his or her patient depends on the existence of any contract between them. Similarly, in *Dingle v. Belin*, 358 Md. 354, 749 A.2d 157 (2000), although the Maryland Court of Appeals noted that "malpractice actions have traditionally been tort-based, the tort arising from the underlying contractual relationship[,]" the court also recognized circumstances in which a duty of care arose in the absence of contract, emphasizing that "care must be taken to keep [tort and contract] actions separate and not to allow the theories, elements, and recoverable damages to become improperly intertwined." *Id.* at 164. Finally, in *Rand v. Miller*, 185 W.Va. 705, 408 S.E.2d 655, 656–58 (1991), the West Virginia Supreme Court recognized that a medical malpractice action presupposed a physician-patient relationship, but the court made no reference to contracts at all.

In light of the foregoing, we conclude that Act 300, § 6(1) simply excludes from the Act's purview releases, dismissals with or without prejudice, or covenants not to sue or not to enforce a judgment given to a co-obligor on an alleged contract debt where the contract was made prior to January 1, 2002. There is no logical reason to construe the exclusion more broadly. Troyer's claims in this case do not depend in any way upon the expectations of the parties to the "contracts" that Dr. Adams invokes, the "contracts" themselves, or the parties' understanding of the statutory framework governing contribution rights at the time that they entered into those "contracts." Troyer's claims are traditional medical malpractice claims. Consequently, we hold that Act 300 governs the settlement in the present matter.

B. *The Meaning Of A Settlement "Given In Good Faith" Pursuant To HRS § 663–15.5*

Neither Act 300 nor HRS § 663–15.5 defines the term "good faith." The House Standing Committee on the Judiciary and

Hawaiian Affairs declared, however, that the purpose of Senate Bill No. 659, which became Act 300, was

> to simplify the procedures and reduce the costs associated with claims involving joint tortfeasors by:
>
> (1) Establishing a new joint tortfeasor release statute that includes the right of contribution;
>
> (2) Repealing the existing joint tortfeasor release statute and right of contribution statute; and
>
> (3) Establishing a good faith settlement procedure for joint tortfeasors and co-obligors.
>
> . . . .
>
> . . . The procedures proposed by the measure are based on a system that has been in existence in California for over ten years.

Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599 (emphases added); accord Sen. Stand. Comm. Rep. No. 828, in 2001 Senate Journal, at 1252–53. The Senate Standing Committee on the Judiciary opined that the bill would "achieve its stated purpose while still adequately protecting the rights of all parties involved." Sen. Stand. Comm. Rep. No. 828, in 2001 Senate Journal, at 1253.

HRS § 663–15.5, see supra note 1, establishes, inter alia, the contribution-among-joint-tortfeasors scheme promulgated by section 4 of the 1955 version of the Uniform Contribution Among Tortfeasors Act (UCATA)[15] and replaced a scheme that was modeled after the 1939 version of the UCATA. See Saranillio v. Silva, 78 Hawai'i 1, 9, 889 P.2d 685, 693 (1995) (noting that Hawai'i adopted the 1939 version of the UCATA in HRS §§ 663–11 to 663–17); 1941 Haw. Sess. L. Act 24, at 188–90. Pursuant to HRS § 663–15 (1993), see supra note 10, which

was repealed by Act 300, a release given by a plaintiff to settling joint tortfeasors barred cross-claims for contribution against the settling joint tortfeasors by non-settling joint tortfeasors only if the release (1) was "given before the right of the other [non-settling joint] tortfeasors to secure a money judgment for contribution ha[d] accrued" and (2) "provide[d] for a reduction, to the extent of the pro rata share of the released[, i.e., settling, joint] tortfeasors, of the [plaintiff's] damages recoverable against all the other [non-settling joint] tortfeasors." A settlement given pursuant to HRS § 663–15.5 now discharges the settling tortfeasor from all liability for contribution to any other party, see HRS § 663–15.5(a)(3), and merely reduces the exposure of non-settling joint tortfeasors pro tanto—i.e., by "the amount stipulated" in the settlement or "the amount of the consideration paid for it, whichever is greater"—so long as the settlement is "given in good faith," see HRS § 663–15.5(a)(2). Thus, HRS § 663–15.5 is less protective of non-settling joint tortfeasors than the statutory scheme it replaced, inasmuch as, pursuant to HRS § 663–15.5, non-settling joint tortfeasors may ultimately be liable for the difference between the consideration paid by the settling joint tortfeasor and the non-settling joint tortfeasors' share of liability, so long as the settlement is given in good faith.

As noted supra in section I.A., HRS § 663–15.5 is similar to provisions contained in a plethora of CATAs in effect across the country that discharge settling tortfeasors from liability for non-settling joint tortfeasors' contribution claims in the event of a "good faith" settlement. The courts that have addressed the meaning of "good faith" for settlement purposes, within the meaning of their own CATAs, have developed three basic standards for determining whether a

---

**15.** Section 4 of the UCATA provides:

When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in an amount of the consideration paid for it, whichever is the greater; and,

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

12 U.L.A. 264 (1996). Cf. HRS § 663–15.5(a), supra note 1. The commissioners' comment to section 4 is set forth in relevant part infra at note 32.

settlement is given in good faith: (1) the "proportionate liability" standard formulated by the California Supreme Court in *Tech–Bilt;* (2) the "non-collusive" or "non-tortious conduct" standard; and (3) the "totality of the circumstances" approach.

Dr. Adams urges us to adopt the *Tech–Bilt* standard of good faith. He argues that the legislature indicated its intent to adopt the *Tech–Bilt* standard by noting that Act 300 is modeled after the "system that has been in existence in California for over ten years" (citing Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599), and that the "non-collusive" standard of good faith that Troyer and Dr. Bellatti urge this court to adopt, as discussed *infra*, is inconsistent with the legislative history of Act 300 and would fail adequately to protect non-settling defendants from inequitable settlements. Therefore, Dr. Adams contends that the circuit court should determine whether a settlement is in "good faith" based on:

> [ (1) ] a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, [ (2) ] the amount paid in settlement, ... and a recognition that a settlor should pay less in settlement than he [or she] would if he [or she] were found liable after a trial. Other relevant considerations include [ (3) ] the financial conditions and insurance policy limits of settling defendants, as well as [ (4) ] the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.

*Tech–Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 159. Moreover, Dr. Adams argues that "[o]ne of the most important factors to be examined in determining good faith is the settling party's proportionate liability and that 'a defendant's settlement figure must not be grossly disproportionate to what a reasonable person at the time of the settlement would estimate the settling defendant's liability to be.' " (Quoting *Tech–Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 166 (internal quotation signals omitted).)

While Troyer acknowledges that "[t]here is some indication that [HRS] § 663–15.5 was modeled after the California [CATA]," she points out that "[HRS] § 663–15.5 does not delineate the specific criteria for determining when a settlement has been reached in good faith" and urges this court to adopt one of two alternative standards that are currently utilized within the United States and "offer a less burdensome system for determining good faith." Troyer maintains that "[c]ourts across the country have been critical of the *Tech–Bilt* [s]tandard, because of the burden that it places on the trial and appellate courts to review the evidence supporting the settlement and because of the negative impact it has on the policy of encouraging settlements." Moreover, she contends that the *Tech–Bilt* standard encourages defense attorneys to file time-consuming appeals from good faith determinations and, consequently, discourages settlements and clogs the appellate courts with appeals from good faith determinations.[16] Accordingly, Troyer urges this court to adopt either (1) the "non-collusive" standard of good faith, by which a settlement is deemed to be given in good faith in the absence of collusion, fraud, or dishonesty, or (2) the "totality of the circumstances" approach, by which the determination of good faith is left to the discretion of the trial court, based on all relevant facts available, and shall not be disturbed in the absence of an abuse of discretion.

Dr. Bellatti suggests that HRS § 663–15.5(a) is modeled after section 4 of the 1955 version of the UCATA, *see supra* note 15, and, therefore, urges this court to look to the UCATA for guidance. Dr. Bellatti maintains that the commissioners who drafted the UCATA sought to encourage settlements while providing courts with an opportunity to prevent collusion among the settling parties. Accordingly, Dr. Bellatti urges this court to adopt the "non-collusive" standard of good faith utilized in *Noyes v. Raymond,* 28 Mass. App.Ct. 186, 548 N.E.2d 196 (1990), which he believes is the best means of accomplishing the foregoing goals. He argues that the *Tech–Bilt* standard requires trial courts to "apply an unworkable standard to every set-

---

**16.** Troyer argues that "[c]onsidering the time that it normally takes a case to work through the appeal process, this could cause Plaintiff-Appel- lee a delay of justice for two years or more before the good faith settlement is ruled upon at the appellate level."

tlement" and, consequently, permits one joint tortfeasor to discourage or impede settlement between the plaintiff and other joint tortfeasors.

Dr. Bailey contends that the settlement in the present matter satisfies the *Tech–Bilt* standard of good faith and does not address the alternative standards.

We begin our analysis by reviewing the three basic standards utilized in other jurisdictions to determine whether a settlement has been given in good faith for purposes of their CATAs.

1. *The Tech–Bilt proportionate liability standard of "good faith"*

In *Tech–Bilt*, the California Supreme Court addressed the meaning of the phrase "settlement ... made in good faith" as it appeared in Cal.Civ.Proc.Code (CCPC) §§ 877 and 877.6 (West 1980 and Supp. 2003),[17] as a matter of first impression, and essentially adopted the standard of good faith previously formulated by the California Court of Appeal in *River Garden Farms, Inc. v. Superior Court,* 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972), which has come to be known as the "proportionate liability test."

The plaintiffs in *Tech–Bilt* were homeowners who filed a complaint, *inter alia,* against Tech–Bilt (their developer) and Woodward–Clyde (their soil engineers) seeking damages for structural defects in their residence. 213 Cal.Rptr. 256, 698 P.2d at 161. The plaintiffs' action against Woodward–Clyde was barred by the applicable statute of limitations. *Id.* Rather than file a motion for summary judgment, however, Woodward–Clyde offered to waive any claims against the plaintiffs for costs incurred in defending the action, which amounted to $55.00, if the plaintiffs agreed to dismiss their claim against Woodward–Clyde with prejudice.[18] *Id.* Woodward–Clyde subsequently moved for (1) a determination that the settlement was given in good faith under the terms of CCPC § 877.6 and (2) summary judgment with respect to Tech–Bilt's cross-claim for indemnity and declaratory relief, pursuant to CCPC § 877. *Id.* The trial court conducted a hearing, determined that the settlement was given in good faith, and granted summary judgment in Woodward–Clyde's favor and against Tech–Bilt on the latter's cross-claim. Tech–Bilt appealed. *Id.*

The California Supreme Court began its analysis by reviewing the legislative history of CCPC §§ 877 and 877.6. Relying upon *River Garden Farms,* the *Tech–Bilt* majority

**17.** At the time, CCPC § 877 provided in relevant part:

Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors.

CCPC § 877.6 provided in relevant part:

(a) Any party to an action in which it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors, upon giving notice in the manner provided. . . .

. . . .

(b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing.

(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

(d) The party asserting the lack of good faith shall have the burden of proof on that issue.

CCPC §§ 877 and 877.6 have subsequently been amended in respects not relevant to the present matter. *See* CCPC §§ 877 and 877.6 (West Supp. 1998).

**18.** The virtue of this course of action was that, pursuant to CCPC § 877, *see supra* note 17, the dismissal shielded Woodward–Clyde from any cross-claims asserted by Tech–Bilt, which, unlike the plaintiff's direct action, were not barred by the applicable statute of limitations. *Tech–Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 161–62.

asserted that " '[t]he major goals of the 1957 tort contribution legislation,' " which promulgated CCPC § 877, were " 'equitable sharing of costs among the parties at fault, and . . . encouragement of settlements.' "[19] *Id.* 213 Cal.Rptr. 256, 698 P.2d at 163 (quoting *River Garden Farms, Inc.*, 103 Cal.Rptr. at 503). The majority noted that the good faith provision of CCPC § 877 "substantially parallels the language of section 4 of the proposed [UCATA] as revised in 1955" and maintained, once again relying upon *River Garden Farms*, that "[t]he commissioners' comment to section 4," *see infra* note 32, "clearly indicates that the good faith language was added to give the courts occasion to review settlements between a plaintiff and one of several tortfeasors to determine whether they prejudiced the interests of a nonsettling tortfeasor." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 163 n. 4 (citing *River Garden Farms*, 103 Cal.Rptr. at 505). Accordingly, the *Tech–Bilt* majority reasoned that "[t]he good faith provision of section 877 mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 163 (quoting *River Garden Farms, Inc.*, 103 Cal.Rptr. at 506).

Moreover, the *Tech–Bilt* majority noted that the legislature's 1980 enactment of CCPC § 877.6 codified the court's recent holding in *American Motorcycle Ass'n v. Superior Court*, 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978), to the effect that "a section 877 settlement bars claims for partial or comparative indemnity as well as for contribution" and reiterated the proviso that settlements must be given in good faith in order to bar such claims. *Id.* 213 Cal.Rptr. 256, 698 P.2d at 164. *American Motorcycle* had cited *River Garden Farms* to "explicate the meaning of the phrase 'good faith settlement' under section 877." *Id.* (citing *American Motorcycle*, 146 Cal.Rptr. 182, 578 P.2d at 899). Therefore, the *Tech–Bilt* majority concluded that the relevant legislative history

"strongly suggests that the Legislature intended the term 'good faith' in section 877.6 [also] to bear the meaning ascribed to that term in section 877 by the Court of Appeal's decision in *River Garden Farms* [.]" *Id.*

In *River Garden Farms*, 103 Cal.Rptr. at 505, the California Court of Appeal held that "[p]revention of collusion is but a means to the end of preventing unreasonably low settlements which prejudice a nonparticipating tortfeasor. The price of a settlement is the prime badge of its good or bad faith." The lawsuit in *River Garden Farms* arose from a fire that killed both parents of two minor children, who themselves suffered serious and permanent disfigurement and physical handicaps. 103 Cal.Rptr. at 501. The children filed suit to recover damages for their own injuries and asserted claims under the state's wrongful death statute for the deaths of their parents. *Id.* The children reached settlements with three of the four named defendants, leaving River Garden Farms (RGF) as the sole remaining defendant. The trial court approved the settlements. *Id.* at 501–02.

On appeal, RGF did not object to the amounts paid in settlement by its joint tortfeasors; neither did it allege collusion or other inequitable conduct on their part. Rather, RGF charged the plaintiff children with bad faith in their allocation of the settlement amounts as between their personal injury and wrongful death claims. *Id.* at 502. Specifically, RGF complained that the plaintiffs allocated $800,000 of their settlement proceeds to the wrongful death claims and only $490,000 to their personal injury claims, despite the fact that they were likely to recover significantly more by virtue of the latter claims. *Id.*

The *River Garden Farms* court noted the linguistic similarity between the "good faith" clause appearing in CCPC § 877, *see supra* note 17, and the UCATA, § 4, *see supra* note 15, which it believed "establishes an inference that the committee amendment sought

---

**19.** The 1957 legislation eliminated the common law rule barring contribution among joint tortfeasors. *See Tech–Bilt*, 213 Cal.Rptr. 256, 698 P.2d at 162 & n. 3. Accordingly, CCPC § 875, which was also enacted by the 1957 legislation,

confers a right of contribution "after one tortfeasor has, by payment, discharged the joint judgment or has paid more than his *pro rata* share thereof. . . ."

to accomplish the 'fair share' objective described in the comments of the Commissioners on Uniform laws." *Id.* at 505. The *River Garden Farms* court declared that

> [t]he Uniform Law Commissioners accompanied their 1955 revision with a statement declaring that the good faith clause "gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge;" that lack of such a provision in the original draft had impeded approach to the goal "that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives of sympathy or spite or because it might be easier to collect from one than from the other...."

*Id.*

In light of its reading of the commissioners' comment, the *River Garden Farms* court concluded that

> [t]he notion of collusion advanced by the Uniform Law Commissioners implies something more than mere confederacy. Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive when it is aimed to injure the interests of an absent tortfeasor. Although many kinds of collusive injury are possible, the most obvious and frequent is that created by an unreasonably cheap settlement. Applied *pro tanto* to the ultimate judgment, such a settlement contributes little toward equitable—even though unequal—sharing.... [U]nreasonably low settlements with the other tortfeasors and the fear of a large unshared judgment may propel the last remaining defendant into a settlement exceeding the plaintiff's remaining damages and transcending that defendant's equitable share.

*Id.*

The *River Garden Farms* court explained that while a precise definition of "good faith" was impossible to formulate, the "price is the immediate signal for the inquiry into good faith, but only one of the many factors influencing the finding." *Id.* at 506. In order to

achieve the statute's objective of encouraging settlements that are equitable, "the good faith clause should not invalidate a settlement within a reasonable range of the settlor's fair share." [20] *Id.*

In light of *River Garden Farms,* the majority in *Tech–Bilt* held that

> the intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. "[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." The party asserting the lack of good faith, who has the burden of proof on that issue (§ 877.6, subd. (d)), should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a "settlement made in good faith" within the terms of section 877.6.

*Id.* 213 Cal.Rptr. 256, 698 P.2d at 166–67 (citations omitted) (brackets in original).

Consequently, the *Tech–Bilt* majority held that the settlement between the plaintiffs and Woodward–Clyde was not made in good faith. The majority noted that

---

**20.** The court did not however, decide whether the allocation challenged in *River Garden Farms* violated the plaintiffs' duty of good faith, holding that "[o]nly a trial court may reach a decision, guided by the evidentiary material presented to it." *River Garden Farms,* 103 Cal.Rptr. at 507.

plaintiffs received nothing in return for the dismissal of their action against Woodward–Clyde except relief from having to pay Woodward–Clyde's costs because they were wrongfully sued. The same net situation would have existed if, mindful of the running of the statute of limitations against them, plaintiffs had not sued Woodward–Clyde in the first place. To say that section 877.6 cloaks Woodward–Clyde with immunity from liability to joint tortfeasors under these circumstances would not serve the goal of encouraging settlement, and it would frustrate the goal of allocating costs equitably among multiple tortfeasors.

*Id.* 213 Cal.Rptr. 256, 698 P.2d at 168.

Chief Justice Bird dissented from the *Tech–Bilt* majority's opinion. 213 Cal.Rptr. 256, 698 P.2d at 168–73. Chief Justice Bird believed that the standard formulated by the majority was unworkable, would discourage settlements and overburden the courts, and was contrary to the intent of the commissioners of the 1955 UCATA, upon which the California legislation was modeled. *Id.* Chief Justice Bird contended that the *River Garden Farms* court had misread the comment. to section 4 of the 1955 UCATA, *see infra* note 32, and that the passage contained in the comments upon which the *Tech–Bilt* majority had based its interpretation of the purposes of the UCATA, § 4 in fact referred to the purpose of section 5 of the 1939 UCATA, which provided "that a settling tortfeasor was not released from liability unless the release provided that the plaintiff's ultimate recovery would be reduced to the extent of the released tortfeasor's *pro rata* share of the damages." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 169–70. But, she noted, the commissioners *repealed* section 5 of the 1939 act in 1955, because they found that " 'reports from the states where the Act is adopted appear to agree that [section 5] has accomplished nothing in preventing collusion' " and

> its effect "has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file. Plaintiff's attorneys are said to refuse to accept any release which contains the provision reduc-

> ing the damages .... because they have no way of knowing what they are giving up."

*Id.* 213 Cal.Rptr. 256, 698 P.2d at 170 (brackets and ellipsis points in original) (quoting 12 U.L.A. 99 (1975), comrs. com. to § 4). The commissioners concluded that " '[i]t seems more important not to discourage settlement than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly[, section 4(b) ] provides that the release in good faith discharges the tortfeasor outright from all liability for contribution.' " *Id.* (brackets in original) (quoting 12 U.L.A. 99 (1975), comrs. com. to § 4). Thus, Chief Justice Bird concluded, contrary to the view of the *Tech–Bilt* majority and the *River Garden Farms* court, that "[t]he commissioners abandoned as unworkable their earlier attempt to protect nonsettling parties from inequity other than that caused by collusive conduct." *Id.* Likewise, Chief Justice Bird believed that the California legislature had "never intended to impose a legal duty upon settling parties to protect the interest of adverse parties at the expense of their own mutual benefit." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 169.

As an additional matter, Chief Justice Bird pointed out that, when *River Garden Farms* was decided, "contribution applied only among joint judgment debtors to the extent of each debtor's *pro rata* share of the judgment." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 171. In the wake of the California Supreme Court's adoption of comparative fault principles as they pertained to joint tortfeasors, a trial court could no longer divine the plaintiff's potential recovery and simply divide that figure by the number of defendants; rather, trial courts were now required to determine the comparative fault of each defendant in order to decide whether the proposed settlement was within the "reasonable range" of the settling tortfeasor's proportionate liability. *Id.* Chief Justice Bird opined that,

> [i]n a complicated case, the time, effort, and expense involved in presenting evidence on all these issues will be considerable. While the trial court has the discre-

tion to determine the good faith issue on the basis of affidavits alone (§ 877.6, subd. (b)), this court cannot predict the percentage of cases in which live testimony will be necessary. The good faith hearings mandated by the majority's decision promise to be lengthy, complex and hotly contested. In my view, they will overburden the courts and severely strain the resources of the parties.

*Id.* 213 Cal.Rptr. 256, 698 P.2d at 171. The effect of the foregoing, according to Chief Justice Bird, would be to discourage settlements because settling defendants would be faced with the prospect of having to pay a sufficient sum to ensure that the settlement would be deemed within the "reasonable range" of their "proportionate liability," while nevertheless remaining obligated to defend the settlement in a lengthy and expensive good faith hearing. Considering the possibility that a jury or judge would find any given joint tortfeasor blameless at trial, the joint tortfeasor "may often decide that he has little to gain by settling." *Id.* 213 Cal. Rptr. 256, 698 P.2d at 172.

In light of the significant difficulties that the *Tech–Bilt* majority's approach would entail, Chief Justice Bird proposed that "a settlement satisfies the good faith requirement if it is free of corrupt intent, *i.e.*, free of intent to injure the interests of the nonsettling tortfeasors. A settlement is made in bad faith only if it is collusive, fraudulent, dishonest, or involves tortious conduct." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 169. Correlatively, Chief Justice Bird preferred to "let the Legislature determine whether a departure from the tortious conduct test of good faith is warranted." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 173.

### 2. Criticism of the Tech–Bilt majority opinion

The *Tech–Bilt* majority opinion has been widely criticized.[21] First, it appears that every court that has reviewed the commissioners' comment to section 4 of the 1955 UCATA has concurred with Chief Justice Bird that the commissioners intended the "good faith" provision merely to provide courts with the opportunity to prevent collusive settlements. *See, e.g., Vertecs Corp. v. Fiberchem, Inc.,* 669 P.2d 958, 961 (Alaska 1983) ("The commissioners have ... recognized that the desire to avoid contribution is an important motive in encouraging settlement."); *Copper Mountain, Inc. v. Poma of America, Inc.,* 890 P.2d 100, 106 (Colo.1995) ("Not only does this comment plainly state that the clause is intended only to give the court 'occasion to determine whether the transaction was collusive,' it also indicates that the Commissioners had as their express purpose the facilitation of settlement, a goal best fostered if the phrase in question is interpreted as requiring noncollusive conduct."); *St. Paul Fire and Marine Ins. Co. v. Shure,* 647 So.2d 877, 880 (Fla.Dist.Ct.App.1995) ("[T]he Commissioner's Comment to the 1955 revision [of the UCATA] provides that the good faith requirement allows the court 'to determine whether the transaction was collusive, and if so there is no discharge.' ") (Quoting *Frier's, Inc. v. Seaboard Coastline R.R. Co.,* 355 So.2d 208, 211 (Fla.Dist.Ct.App.1978)); *In re Guardianship of Babb,* 162 Ill.2d 153, 205 Ill.Dec. 78, 642 N.E.2d 1195, 1199 (1994) ("clause requiring that a good faith settlement was intended to give courts 'occasion to determine whether the transaction was collusive,' and if so, there was no discharge from contribution liability"); *Noyes v. Raymond,*

---

**21.** Notably, Justice Mosk, who joined the majority opinion in *Tech–Bilt*, subsequently changed his mind. In *Abbott Ford, Inc. v. The Superior Court of Los Angeles County,* 43 Cal.3d 858, 239 Cal. Rptr. 626, 741 P.2d 124 (1987), Justice Mosk wrote a dissenting opinion in which he allied himself with CJ Bird's dissenting opinion in *Tech–Bilt.* Like Chief Justice Bird, Justice Mosk believed that the *Tech–Bilt* majority had erred in its interpretation of the purposes of the UCATA, § 4 and, moreover, that "on the basis of all the available evidence it must be presumed that in enacting section 877 the [California] Legislature

had the same intent that the National Conference of Commissioners had in drafting section 4 of the Uniform Act." *Id.* 239 Cal.Rptr. 626, 741 P.2d at 151–52. Justice Mosk went on to explain that "equitable sharing presupposes that the parties have in fact been adjudged liable; section 877, however, expressly governs releases given before liability has been determined." *Id.* 239 Cal.Rptr. 626, 741 P.2d at 152. Consequently, according to Justice Mosk, "the Legislature could not reasonably" have intended that section 877 further "the goal of equitable sharing among parties adjudged liable for the plaintiff's injury." *Id.*

28 Mass.App.Ct. 186, 548 N.E.2d 196, 199 (1990) ("According to the commissioners who drafted the 1955 version, there were two purposes behind the changes[: (1) ] to prevent collusion amongst the settling parties[; and (2) ] to encourage settlements."); *Smith v. Monongahela Power Co.*, 189 W.Va. 237, 429 S.E.2d 643, 651 (1993) ("The Commissioners clearly placed precedence upon the goal of furthering settlements, rather than equitably apportioning the burdens of liability, commenting: 'It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit.' ").

Second, a number of courts have criticized the *Tech–Bilt* approach to determining good faith on the basis that it discourages settlements and places a severe burden on the trial and appellate courts. The *Noyes* court believed:

> The goal of encouraging settlements may be achieved only to the extent that motions for discharge based upon settlements are routinely allowed, with extended hearings on the question of good faith the exception. If it were otherwise, a party seeking to avoid trial by settling a claim could rarely achieve that objective; either the issue of good faith would be the subject of a full trial or ... a defendant who settles with a plaintiff may, nevertheless, be forced to stand trial on the merits of the tort claim. Faced with such prospects, a defendant would have little incentive to enter into a settlement.

548 N.E.2d at 199. *Accord Copper Mountain*, 890 P.2d at 105 (rejecting the *Tech–Bilt* majority's "reasonable range" standard "both for its potentially negative impact on the policy [of] encouraging settlement" and "for the additional burdens it creates for trial courts in conducting evidentiary hearings to

determine a party's likely proportionate liability"); *Mahathiraj v. Columbia Gas of Ohio, Inc.*, 84 Ohio App.3d 554, 617 N.E.2d 737, 740–41 (1992) (noting a number of problems inherent in the *Tech–Bilt* standard, including: (1) the "additional burdens for trial courts in conducting evidentiary hearings, or minitrials, to determine a party's likely proportionate liability"; (2) the difficulty and lack of certainty in foreseeing "whether a jury would find a particular party liable, and if liable, the proportion of liability the party would likely bear as well as the sum of damages the jury would award"; and (3) the effect that the uncertainty and expense of defending a settlement would have on the willingness of parties to settle); *Brooks v. Wal–Mart Stores, Inc.*, 139 N.C.App. 637, 535 S.E.2d 55, 62 (2000) ("mandating that the court [consider the *Tech–Bilt* factors] in every case would indisputably be disruptive of, and discouraging to, settlement").[22]

Indeed, we are not aware of *any* state jurisdiction, other than California, that has adopted the *Tech–Bilt* standard in whole; *but see Miller v. Christopher*, 887 F.2d 902, 908 n. 2 (9th Cir.1989) (utilizing the *Tech–Bilt* standard of good faith without deciding whether "it would be a proper [standard] should federal maritime law adopt the 'good faith' settlement bar" mandated by the UCATA); *Yusen Air & Sea Services (Guam), Inc. v. Superior court of Guam*, 1993 WL 245645, *5 (D. Guam 1993) (noting that Guam Code of Civil Procedure (GCCP) § 835(e) mandates the use of the *Tech–Bilt* standard); although, as discussed more fully *infra*, aspects of *Tech–Bilt* have been incorporated within other approaches. Rather, courts outside of California, which have addressed the meaning of a "good faith" settlement for purposes of their own CATAs, have utilized either a "non-collusive" standard of good

---

**22.** It is worth noting in this regard, however, that the North Carolina and Ohio courts expressed their reluctance to require trial courts to consider a host of specific issues in the absence of a statutory requirement that the trial court conduct a good faith hearing at all. *See Brooks*, 535 S.E.2d at 61 ("In the absence [of a statutorily prescribed hearing], we deem it inappropriate to direct consideration by our trial courts of a specified set of factors on each occasion the good

faith nature of a settlement is questioned."); *Mahathiraj*, 617 N.E.2d at 741 (noting that Ohio's CATA, unlike California's, did not provide for a good faith hearing and further stating its reluctance "to impose such a requirement absent a statutory basis therefor"). In this respect, of course, these states' CATAs differ materially from HRS § 663–15.5(b), (c), and (d), *see supra* note 1, which provides for a good faith hearing.

faith or a "totality of the circumstances" approach to the issue.

### 3. The "non-collusive" standard of good faith

■■■ At least four states that have rejected the *Tech–Bilt* standard utilize the "non-collusive" or "non-tortious conduct" standard of good faith in determining whether a settlement bars cross-claims for contribution or indemnification against the settling joint tortfeasor. *See Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* 828 P.2d 745, 759 n. 34 (Alaska 1992) ("Under Alaska's [CATA [23]] what is required is honesty and disclosure but not a concern for the effect of the settlement on other defendants."); *Vertecs Corp.,* 669 P.2d at 961 ("tortious or other wrongful conduct [constitutes] bad faith" under Alaska's CATA); *Copper Mountain, Inc.,* 890 P.2d at 108 ("for purposes of [Colo. Rev.Stat. § 13–50.5–105 (2002) [24]] a settlement is reached in 'good faith' in the absence of collusive conduct"); *Noyes,* 548 N.E.2d at 199 ("lack of good faith . . . in the context of [Mass. Gen. Laws Ann. ch. 231B, § 4 (West 2000) [25]] . . . . certainly includes collusion, fraud, dishonesty, and other wrongful conduct"); *Friend v. Dibble,* 124 Misc.2d 151, 475 N.Y.S.2d 765, 766 (N.Y.Sup.Ct.1984) ("The [good faith] requirement of [N.Y. Gen. Oblig. § 15–108 (McKinney 2001) [26]] permits

the Court to determine whether the transaction was collusive."). Pursuant to the "non-collusive" or "non-tortious conduct" standard, a settlement is deemed to be in good faith absent collusion, fraud, dishonesty, or other wrongful conduct. Concomitantly, if the settlement involved collusion, fraud, dishonesty, or other wrongful conduct, there is no discharge of the settling joint tortfeasor's potential liability for contribution vis-a-vis non-settling joint tortfeasors. The benefit of the "non-collusive" or "non-tortious" conduct standard of good faith is that it simplifies the procedures of the court charged with determining whether a settlement is given in good faith and renders extended hearings on the question of good faith the exception, rather than the rule.

### 4. The "totality of the circumstances" approach

Other courts have adopted a "totality of the circumstances" approach to determining whether a settlement has been reached in good faith for purposes of their CATAs. The determination of good faith is left to the discretion of the trial court, based on all relevant facts available at the time of the settlement, and is not disturbed in the absence of an abuse thereof. *See Johnson v. United Airlines,* 203 Ill.2d 121, 271 Ill.Dec. 258, 784 N.E.2d 812, 821 (2003) ("whether a

---

23. Alaska's CATA did not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1. *See Bohna,* 828 P.2d at 758 n. 33. In the absence of a settlement, however, Alaska's CATA allocated liability among joint tortfeasors equally, rather than on the basis of their relative fault, as provided by HRS § 663–12. *See Vertecs Corp. v. Reichhold Chemicals, Inc.,* 661 P.2d 619, 625 (Alaska 1983). Alaska's CATA was subsequently repealed. *See* 1987 Initiative Proposal No. 2, § 2 (eliminating contributions among joint tortfeasors and creating a pure several liability obligation as to each individual tortfeasor).

24. Colo.Rev.Stat. § 13–50.5–105 bars cross-claims for contribution against a settling tortfeasor if the settlement is "given in good faith." Unlike HRS § 663–15.5(a) and the UCATA, § 4, however, the Colorado statute reduces the non-settling tortfeasors' liability by the settling tortfeasor's percentage of fault. *See* Colo.Rev.Stat. § 13–50.5–105(1)(a). Thus, the Colorado statute differs in material respects from HRS § 663–15.5(a), *see supra* note 1.

25. For present purposes, Mass. Gen. Laws ch. 231B, § 4 does not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1. In the absence of a settlement, however, Massachusetts's CATA allocates liability among joint tortfeasors in equal shares, rather than on the basis of their relative fault, as provided by HRS § 663–12. *See Zeller v. Cantu,* 395 Mass. 76, 478 N.E.2d 930 (1985).

26. N.Y. Gen. Oblig. § 15–108 bars cross-claims for contribution against a settling tortfeasor if the settlement is "given in good faith." Unlike HRS § 663–15.5(a) and the UCATA, § 4, however, the New York statute reduces the non-settling tortfeasors' liability by the settling tortfeasor's percentage of fault, if it is greater than the consideration paid by the settling tortfeasor or the amount stipulated in the settlement. *See* N.Y. Gen. Oblig. § 15–108(a). Thus, the New York statute differs in material respects from HRS § 663–15.5(a), *see supra* note 1.

settlement satisfies the good-faith requirement as contemplated by [740 Ill. Comp. Stat. Ann. 100/2 (West 2002)[27]] is a matter left to the discretion of the trial court based upon the court's consideration of the totality of the circumstances" (citing *Dubina v. Mesirow Realty Development, Inc.*, 197 Ill.2d 185, 258 Ill.Dec. 562, 756 N.E.2d 836, 840 (2001), and *In re Guardianship of Babb*, 162 Ill.2d 153, 205 Ill.Dec. 78, 642 N.E.2d 1195, 1199–1200 (1994))); *Ballweg v. City of Springfield*, 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373, 1380 (1986) ("the entire circumstances surrounding a settlement must be taken into account"); *Velsicol Chemical Corp. v. Davidson*, 107 Nev. 356, 811 P.2d 561, 563 (1991) ("determination of good faith" for purposes of Nev. Rev. Stat. § 17.245 (2001)[28] "should be left to the discretion of the trial court based upon all relevant facts available, and . . . in the absence of an abuse of that discretion, the trial court's findings should not be disturbed"); *Brooks*, 535 S.E.2d at 62 (instructing trial courts to consider the "totality of the circumstances" in determining whether a settlement is given in good faith for purposes of N.C. Gen.Stat. Ann. § 1B–4 (LexisNexis 2001)[29]); *Mahathiraj*, 617 N.E.2d at 742 ("a totality of the circumstances test should be applied in determining whether or not a settlement in a joint tortfeasor case is reached in 'good faith' for purposes of [Ohio's CATA[30]]"); *Smith*, 429 S.E.2d at 651 (instructing the trial court to consider, in its discretion, aspects of both the "non-tortious" conduct test and the *Tech–Bilt* standard in determining whether a settlement is in "good faith").

**27.** For present purposes, 740 Ill. Comp. Stat. 100/2 does not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1.

**28.** For present purposes, Nev. Rev. Stat § 17.245 does not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1. In the absence of a settlement, however, Nevada's CATA allocates liability among joint tortfeasors in equal shares, rather than on the basis of their relative fault, as provided by HRS § 663–12. *See* Nev.Rev.Stat. § 17.295 (2001).

**29.** For present purposes, N.C. Gen.Stat. § 1B–4 does not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS

Although some of the courts adopting the "totality of the circumstances" approach have focused on the 1955 UCATA, § 4 and concluded, like the courts adopting the "non-tortious" conduct test, that the drafters of the 1955 UCATA favored the "tortious conduct" approach because "[t]he Commissioners clearly placed precedence upon the goal of furthering settlements, rather than equitably apportioning the burdens of liability," *Smith*, 429 S.E.2d at 651; *accord In re Babb*, 205 Ill.Dec. 78, 642 N.E.2d at 1199, these courts acknowledge the concerns that motivated the California Supreme Court in *Tech–Bilt*. In *In re Babb*, 205 Ill.Dec. 78, 642 N.E.2d at 1205, for example, the Illinois Supreme Court noted that, in addition to encouraging settlements, its CATA sought "equitably [to distribute] among all joint tortfeasors the burden of compensating an injured plaintiff." *Accord Johnson*, 271 Ill.Dec. 258, 784 N.E.2d at 821; *Dubina*, 258 Ill.Dec. 562, 756 N.E.2d at 841. The Illinois Supreme Court reasoned that the "totality of the circumstances" approach "allows trial courts to give effect to the strong public policy favoring the peaceful settlement of claims[ ] and at the same time allows trial courts to be on guard for any evidence of unfair dealing, collusion, or wrongful conduct by the settling parties." *Dubina*, 258 Ill.Dec. 562, 756 N.E.2d at 840 (citing *Babb*, 205 Ill.Dec. 78, 642 N.E.2d at 1199).

Similarly, in *Smith*, the West Virginia Supreme Court concluded that

the "tortious conduct" approach best reflects our commitment to the strong public policy favoring out-of-court settlements and best furthers the objectives of finality

§ 663–15.5(a), *see supra* note 1. In the absence of a settlement, however, North Carolina's CATA allocates liability among joint tortfeasors in equal shares, rather than on the basis of their relative fault, as provided by HRS § 663–12. *See* N.C. Gen.Stat. § 1B–2(1) (LexisNexis 2001).

**30.** For present purposes, Ohio's CATA did not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1. *See* Ohio Rev.Code Ann. § 2307.32 (West 1994 & Supp.2003). Ohio's CATA was subsequently repealed. *See* 2001 Ohio Laws 108, § 2.02.

of judgments and judicial economy. But in view of experiences elsewhere and legal commentary, this court remains concerned that a bald "tortious conduct" approach might pose a burden so great as to impair substantially the right of a non-settling joint tortfeasor to receive a fair trial.

429 S.E.2d at 651 (footnotes omitted). Therefore, the *Smith* court incorporated aspects of both approaches. *Id.*

The Ohio court in *Mahathiraj,* 617 N.E.2d at 742, also acknowledged the importance of "preventing liability from being allocated in an inequitable manner," but believed that

a standard of good faith that relies too heavily on the proportion of liability borne by each party deters settlement because it enables non-settling parties to attack settlements by alleging that a settlement allocates liability disproportionately, while a standard that ignores proportionate liability runs the risk of purchasing certainty in settlements at the expense of tolerating collusive activity.

In any event, all of the courts adopting the "totality of the circumstances" approach, even those that have not expressly echoed *Tech–Bilt's* concern regarding disproportionately low settlements, have included the settlement amount among the factors that the trial court, in its discretion, may consider in determining the "good faith" of a settlement.

Thus, in *Mahathiraj,* the Ohio court explained that

a totality of the circumstances standard enables the trial court to consider the potential proportionate liability of the parties in cases where such determinations are appropriate, but does not require the court to consider it in every case or in cases where such calculations would be of little value in good faith determinations. As a result, parties have a greater incentive to settle than they would under a standard which forces them to defend their settlements whenever the mere allegation of a disproportionate settlement is made. At the same time, courts are free to police collusive settlements that unfairly saddle one tortfeasor with a disproportionate share of liability.

. . . .

... Other factors courts may consider include, but are not limited to, whether the challenging party has demonstrated evidence indicating collusion, fraud or other tortious or wrongful conduct on the part of the settling parties.

*Id.* at 741–42.

Likewise, in *Smith,* the West Virginia Supreme Court held that courts may consider: (1) the amount of the settlement in comparison to the potential liability of the settling tortfeasor *at the time of settlement,* in view of such considerations as (a) a recognition that a tortfeasor should pay less in settlement than after an unfavorable trial verdict, (b) the expense of litigation, (c) the probability that the plaintiff would win at trial, and (d) the insurance limits and solvency of all joint tortfeasors; (2) whether the settlement is supported by consideration; (3) whether the motivation of the settling plaintiff and settling tortfeasor was to single out a non-settling defendant or defendants for wrongful tactical gain; and (4) whether there exists a relationship, such as family ties or an employer-employee relationship, naturally conducive to collusion.

429 S.E.2d at 652 (emphasis in original); *accord Brooks,* 535 S.E.2d at 62 ("a trial court may, without being specifically obligated to do so, consider any of the factors delineated in *Tech–Bilt,* or examine whether the settlement was collusive ... if such inquiry is warranted by the facts of the individual case").

Thus, the totality of the circumstances approach permits the court to ferret out collusive settlements in which the settlement amount may not be the "prime badge" of bad faith. In *In re Babb,* 205 Ill.Dec. 78, 642 N.E.2d at 1204, for example, the Illinois Supreme Court held that loan-receipt agreements, whereby a settling defendant provides a plaintiff with a loan to be repaid out of any damages recovered from a non-settling defendant, are collusive, because they allow a settling tortfeasor to indirectly obtain a contribution from a non-settling tortfeasor and deprive a non-settling tortfeasor of a "set-off," in contravention of the Illinois CATA.

For the same reason, the *Babb* court also disapproved settlement agreements that grant a settling defendant control over the plaintiff's right to settle with other tortfeasors. *Id.*

Similarly, in *Dubina*, the Illinois Supreme Court held that the assignment of the plaintiffs' claims to the settling defendants in a separate transaction from the settlement agreement violated the terms and policies of the state's CATA, because the amount paid for the assignment would not be included in the set-off that the non-settling defendants would be able to seek if they were subsequently found liable for damages; surveying the totality of the circumstances, the *Dubina* court concluded that the settlement agreement would not have been reached but for the assignment of the plaintiffs' claims. 258 Ill.Dec. 562, 756 N.E.2d at 842–43. Accordingly, the *Dubina* court held that the settlement agreements were collusive and not given in "good faith." *Id.* 258 Ill.Dec. 562, 756 N.E.2d at 843.

In *International Action Sports, Inc. v. Sabellico*, 573 So.2d 928 (Fla.Dist.Ct.App.1991), the Florida appellate court held that a settlement that was clearly intended solely to shield the plaintiff's family member from liability did not constitute a good faith settlement pursuant to Fla. Stat. ch. 768.31(5) (2003).[31] Finally, in *Sobik's Sandwich Shops,*

*Inc. v. Davis,* 371 So.2d 709 (Fla.Dist.Ct.App. 1979), the Florida appellate court concluded that

> [i]f [the] "good faith" condition is to have any meaning at all consistent with the underlying purposes of the contribution act, we believe that it prevents a claimant from arbitrarily deciding how much each tortfeasor will pay on the basis of which tortfeasor has been more cooperative with claimant. There must be some reasonable basis for the amount of the settlement with the tortfeasors beyond the claimant's express desire to have those who appeal pay and those who do not appeal be relieved of responsibility.

*Id.* at 711–12.

5. *Hawai'i courts should consider the totality of the circumstances in determining whether a settlement was given in good faith for purposes of HRS § 663-15.5.*

 In light of the foregoing, we adopt the "totality of the circumstances" approach to determining whether a settlement was given in "good faith" for purposes of HRS § 663–15.5. First, we agree with the overwhelming majority of courts that have concluded, based on the commissioners' comment to section 4 of the UCATA,[32] that the

---

**31.** For present purposes, Fla. Stat. ch 768.31(5) does not differ in any material respect from either the UCATA, § 4, *see supra* note 15, or HRS § 663–15.5(a), *see supra* note 1. Although the Florida Supreme Court has never addressed the question, several of the state's courts of appeal have considered the meaning of a good faith settlement pursuant to Fla. Stat. § 768.31(5) and appear to utilize aspects of all three standards in order to ferret out collusion, *see, e.g., St. Paul Fire and Marine Ins. Co. v. Shure,* 647 So.2d 877 (Fla.Dist.Ct.App.1995); *International Action Sports, Inc.,* 573 So.2d 928; *Sobik's Sandwich Shops, Inc. v. Davis,* 371 So.2d 709 (Fla.Dist.Ct. App.1979), and, consequently, utilize a version of the "totality of the circumstances" approach to determining good faith.

**32.** The relevant parts of the comment to section 4 are as follows:

> The 1939 Act provided, in Section 5, that a release of any tortfeasor should not release him from liability for contribution unless it expressly provided for a reduction "to the extent of the pro rata share of the released tort-

feasor" of the injured person's recoverable damages. This provision has been one of the chief causes for complaint where the Act has been adopted, and one of the main objections to its adoption.

> The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction is collusive, and if so there is no discharge.

> The idea underlying the 1939 provision was that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives of sympathy or spite, or because it might be easier to collect from one than from the other; and that the release from contribution affords too much opportunity for collusion between the plaintiff and the released tortfeasor against the one not released. Reports from the state where the Act is adopted appear to agree that it has accomplished nothing in preventing collusion. In most three-party cases two parties join hands against the third, and this occurs even when the case goes to trial against both defendants. "Gentlemen's agreements" are still made among lawyers, and the formal

commissioners intended the "good faith" provision merely to provide the court with an opportunity to prevent collusive settlements aimed at injuring the interests of a non-settling joint tortfeasor. Simply put, we believe that the majority in *Tech–Bilt* misread the commissioners' comment and that the conclusions that the majority drew therefrom are similarly flawed. The commissioners clearly were more interested in encouraging settlements than making "an attempt of doubtful effectiveness to prevent" inequitable settlements. Inasmuch as HRS § 663–15.5(a) appears to be modeled after section 4 of the 1955 UCATA and replaced a CATA modeled after the prior UCATA, we deem the commissioners' intent to be persuasive in ascertaining the intent of the Hawai'i legislature.

Moreover, as noted above, in adopting Act 300, our legislature abandoned a statutory scheme that afforded a non-settling joint tortfeasor greater protection than in the post-Act 300 environment. Specifically, before the promulgation of Act 300,

> if, by agreement of the parties, a release reduce[d] the plaintiff's claim against all *unreleased* joint tortfeasors by the greater of the amount of the consideration paid by the *released* tortfeasor or the released tortfeasor's proportionate responsibility for the plaintiff's total claim, then, by definition, there [was] no possibility that an *unreleased* tortfeasor could have a claim for indemnification [or contribution] against

the settling *released* tortfeasor. This [was] the case because, by virtue of the contractual and proportionate reduction of the plaintiff's claim, an *unreleased* tortfeasor [could] never be liable to the plaintiff for any damages apportionable to the *released* tortfeasor. Obviously, a potentially settling tortfeasor always ha[d] the option of insisting on the full protections of [the pre-Act 300 UCATA]. Whether a defendant-tortfeasor [would] choose to negotiate for these protections [was] a matter of his or her own cost-benefit analysis, although it [was] probably the rare defendant-tortfeasor who [would] not.

*Saranillio,* 78 Hawai'i at 18, 889 P.2d at 702 (Levinson, J., concurring) (emphases in original). Thus, the legislature's codification of Act 300 suggests that, like the drafters of the 1955 UCATA, it was more interested in encouraging settlements than ensuring the equitable apportionment of liability.

Second, although our legislature was clearly mindful of the "system that has been in existence in California for over ten years," the legislature expressly declared its intent to "simplify the procedures and reduce the costs associated with claims involving joint tortfeasors." Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599. This legislative purpose would be difficult to accomplish if we were to adopt the *Tech–Bilt* standard of good faith and require that trial courts conduct "mini-trials" in order to determine the parties' likely proportionate liabili-

---

release is not at all essential to them. If the plaintiff wishes to discriminate as to the defendants, the 1939 provision does not prevent him from doing so.

The effect of Section 5 of the 1939 Act has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file. Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages "to the extent of the pro rata share of the released tortfeasor," because they have no way of knowing what they are giving up. The "pro rata share" cannot be determined in advance of judgment against the other tortfeasors. In many cases their chief reason for settling with one rather than another is that they hope to get more from the party with whom they do not settle. A provision for reduction in fixed amount will not protect the settling tortfeasor from contribution. No de-

fendants wants to settle when he remains open to contribution in an uncertain amount, to be determined on the basis of a judgment against another in a suit to which he will not be a party. Some reports go so far as to say that the 1939 Act has made independent settlements impossible. Many of the complaints come from plaintiff's attorneys, who say that they can no longer settle cases with one tortfeasor. Such reports have reached other states,· and have been responsible for a considerable part of the opposition to the 1939 Act....

It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly the subsection provides that the release in good faith discharges the tortfeasor outright from all liability for contribution.

12 U.L.A. 264–65, comrs. com. to § 4.

ty. "It [would] clog our trial courts with unnecessary hearings, discourage the settlement of legitimate claims, and severely strain the resources of the parties and the trial and appellate courts of this state." *Tech–Bilt*, 213 Cal.Rptr. 256, 698 P.2d at 168 (Bird, C.J., dissenting). "The goal of encouraging settlements may be achieved only to the extent that motions for discharge based upon settlements are routinely allowed, with extended hearings on the question of good faith the exception." *Noyes*, 548 N.E.2d at 199. Consequently, we believe that our legislature's reference to the California "system" was merely an observation that HRS § 663–15.5, like CCPC § 877.6, *see supra* note 17, specifically provides for a good faith hearing, which affords the court occasion to determine whether the transaction is aimed at injuring a non-settling party. We do not believe that our legislature intended that the Hawai'i courts adopt the California courts' definition of "good faith."

Third, the price of a settlement alone rarely appears to be the outcome-dispositive factor regarding a settlement's bad faith. In *River Garden Farms*, for example, the settlement was deemed to have been given in bad faith by virtue of the manner in which the plaintiffs allocated the proceeds from the settlements among their claims for relief, rather than the amount that the settling tortfeasors paid to buy their peace. In *Tech–Bilt* itself, although the paltry settlement was indisputably a factor in the court's decision, the *Tech–Bilt* court appeared to be particularly galled by the fact that the statute of limitations had run on the plaintiffs' claims but not on the non-settling tortfeasor's cross-claim:

> [P]laintiffs received nothing in return for the dismissal of their action against Woodward–Clyde except relief from having to pay Woodward–Clyde's costs because they were wrongfully sued. The same net situation would have existed if, mindful of the running of the statute of limitations against them, plaintiffs had not sued Woodward–Clyde in the first place.

213 Cal.Rptr. 256, 698 P.2d at 168.

In other cases, bad faith settlements have involved the shielding of a family member from cross-claims, *see, e.g., International Action Sports, Inc.*, 573 So.2d at 929, or loan-

receipt agreements that allow a settling tortfeasor to indirectly obtain a contribution from a non-settling tortfeasor, *see, e.g., In re Babb*, 205 Ill.Dec. 78, 642 N.E.2d at 1204. A "totality of the circumstances" approach is better suited to addressing these kinds of problems than a strict "proportionate liability" test.

In sum, we conclude that the legislature's goals of simplifying the procedures and reducing the costs associated with claims involving joint tortfeasors, while providing courts with the opportunity to prevent collusive settlements aimed at injuring non-settling tortfeasors' interests, are best served by leaving the determination of whether a settlement is in good faith to the sound discretion of the trial court in light of the totality of the circumstances surrounding the settlement.

█ Thus, the trial court may consider the following factors to the extent that they are known at the time of settlement: (1) the type of case and difficulty of proof at trial, e.g., rear-end motor vehicle collision, medical malpractice, product liability, etc.; (2) the realistic approximation of total damages that the plaintiff seeks; (3) the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial; (4) the predicted expense of litigation; (5) the relative degree of fault of the settling tortfeasors; (6) the amount of consideration paid to settle the claims; (7) the insurance policy limits and solvency of the joint tortfeasors; (8) the relationship among the parties and whether it is conducive to collusion or wrongful conduct; and (9) any other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by other wrongful purpose. The foregoing list is not exclusive, and the court may consider any other factor that is relevant to whether a settlement has been given in good faith. On appeal, the trial court's determination will be reviewed for abuse of discretion.

C. *The Circuit Court Did Not Abuse Its Discretion In Determining That The Settlement Between Troyer And Drs. Bailey And Bellatti Was Given In Good Faith.*

█ Dr. Adams contends that the circuit court abused its discretion in finding that

Troyer's settlement with Drs. Bailey and Bellatti was given in good faith on the basis that the settlement "caused a grossly disproportionate allocation of damages against him" and is "manifestly unfair," because the only "admissible evidence" in the present matter indicates that none of the defendants were negligent and that Troyer's injuries are "due to the circumstances of her original injury." Dr. Adams argues that the circuit court is only permitted to consider "admissible" evidence in the good faith hearing and that the "other" evidence adverted to in HRS § 663-15.5(c), *see supra* note 1, refers to "admissible" evidence other than "affidavits or declarations," such as live or deposition testimony or other evidence admissible under the Hawai'i Rules of Evidence (HRE). Consequently, Dr. Adams argues, "*at most,* [Troyer's] claims for injury should be divided equally among the alleged joint tortfeasors." (Emphasis in original.) Yet, according to Dr. Adams, Troyer's settlements with Drs. Bailey and Bellatti "leave [him] potentially liable for 95 [percent or more] of [Troyer's] damages."

Dr. Adams further alleges (1) that Troyer's own experts, Drs. Yates and Weaver, "strongly opine[d] that the settling [d]efendants were liable for [Troyer's] injuries, before she even reached Dr. Adams" and (2) that Troyer "has repeatedly admitted" that Dr. Bailey and Dr. Bellatti caused her injuries. Dr. Adams contends that Troyer "cannot repeatedly blame her Kona doctors for her injuries, adopt expert reports blaming them for her injuries, and then suddenly seek grossly disproportionate liability from Dr. Adams." Correlatively, he argues that the circuit court abused its discretion by depriving him of "material witnesses and essential testimony relevant to the Act 300 determination," to wit, by not permitting him to depose Drs. Yates and Weaver in order to adduce evidence of the proportionate liability of Drs. Bailey and Bellatti.

Finally, Dr. Adams alleges that Troyer engaged in "tortious conduct" by failing to disclose the following to the circuit court: (1) certain "admissions" attributing her injuries to Dr. Bailey and Dr. Bellatti; and (2) that she had failed to produce herself or any of her experts for deposition, despite "(a) her prior agreements to produce them, (b) a Court Order requiring her to do so, and (c) Dr. Adams'[s] prior notices of deposition and repeated requests for deposition of these witnesses."

Troyer counters that "the facts of this case demonstrate that the settling parties entered into a settlement that meets the criteria of any one of the three models for determining good faith settlements." Troyer contends that the instant settlements should be presumed reasonable because they were conducted in an adversary setting (citing *Regan Roofing Co. v. Superior Court,* 21 Cal. App.4th 1685, 27 Cal.Rptr.2d 62, 74 (1994)) and that Dr. Adams bears the burden of proving that there was no substantial evidence upon which the circuit court could have concluded that the instant settlement was given in good faith. Troyer maintains that the circuit court was presented with "a great deal of evidence and information to allow it to conclude that [the] settling parties were acting in good faith." Specifically, she notes the opinion of her expert in vascular surgery, Dr. Levine, "who stated that Plaintiff–Appellee's foot was viable and salvageable at the time she came under [Dr.] Adams'[s] care" in a report that Troyer submitted to the circuit court with her petition. Although she admits that two of her own experts, Drs. Yates and Weaver, criticized the care provided by Drs. Bailey and Bellatti, she maintains (1) that her experts' opinions were "counterbalanced" by those of the settling defendants' own experts, (2) that Dr. Adams never criticized the care provided by either Dr. Bailey or Dr. Bellatti and neglected to produce a single expert, "whom he would have been able to call at trial, who attributed any liability whatsoever to [them]," and (3) that her decision to settle was based largely on the outcome of the proceeding before the MCCP, which "completely cleared" Drs. Bailey and Bellatti of wrongdoing but "questioned" Dr. Adams's treatment.

Troyer suggests that Dr. Adams "misreads" HRS § 663-15.5(c), *see supra* note 1, in claiming that the trial court may only consider "admissible evidence" in reaching its determination, inasmuch as that subsec-

tion permits the trial court to consider affidavits, declarations and "other evidence" in its discretion.

Finally, Troyer charges that Dr. Adams "failed to zealously pursue his cross-claims" by failing to retain expert witnesses and is now attempting to remedy his failure by seeking to depose her expert witnesses. Having settled with Drs. Bailey and Bellatti, Troyer contends that Hawai'i caselaw prohibits Dr. Adams from calling Drs. Yates and Weaver as witnesses to testify at trial. Therefore, she maintains that the circuit court did not abuse its discretion in denying Dr. Adams the opportunity to depose them.

Dr. Bailey argues that she paid valuable consideration to settle Troyer's claims against her and that the amount that she paid reflected the tenuous nature of Troyer's claims in light of the facts that (1) Dr. Bailey's codefendants, including Dr. Adams, exonerated her of any negligence and (2) the only criticism of her was based on Dr. Yates's mistaken belief that KCH possessed the equipment necessary to perform an arteriogram. In other words, according to Dr. Bailey, the instant settlement "properly reflects the difficulty [Troyer] would have [encountered in attempting to] establish[ ] liability against any of the defendant physicians, and in particular against Dr. Bailey." Inasmuch as none of the defendants in the present matter admit their liability, she argues, "[i]t cannot . . . be improper, collusive[,] or in bad faith for any physician to settle with [Troyer] for any figure which represents an amount [Troyer] is willing to accept[,] because any settlement exceeds the settling [defendant's] share of fault." Indeed, she contends that the settlement actually constitutes a "potential windfall for Dr. Adams." Dr. Bellatti makes the same point in a slightly different fashion, arguing that, even "[u]nder the *Tech–Bilt* standard, Dr. Bellatti has no liability, so his proportionate share is zero."

Drs. Bailey and Bellatti both characterize Dr. Adams's arguments regarding Troyer's experts as "gamesmanship." Dr. Bailey maintains that

> Dr. Adams asked the trial court to ignore his own testimony and the testimony of his

own expert witness and to allow him instead to assert a set of opinions through experts he had not retained and with whom he had no formal arrangement, over the objection of the party who had retained the experts and where such opinions were fundamentally inconsistent with his own theory of the case, to defeat the proposed settlements. The trial court reasonably refused.

Like Troyer, Dr. Bailey contends that Dr. Adams would not be permitted to call Troyer's expert witnesses at trial against her will "absent a showing of exceptional circumstances"—*e.g.*, possession by the expert of "some specific piece of information, test result, unique observation or opportunity [that] is not equally available to experts who might be retained by other parties." Dr. Bailey maintains that Drs. Yates and Weaver did not possess any unique information. Dr. Bellatti contends that "[i]t was only after [Troyer] agreed to settle her claims against Drs. Bailey and Bellatti that Dr. Adams started to 'make a record' that he wanted to depose [Troyer's] experts for purposes of his cross[-]claims." In addition, Dr. Bellatti claims that one of the reasons that he settled with Troyer was to avoid the attorney's fees and costs of deposing Drs. Yates and Weaver on the mainland, implying that it would now be unfair to require him to pay those costs notwithstanding his attempt to buy his peace with Troyer.

We hold that the circuit court did not abuse its discretion in concluding that the instant settlement was given in good faith. First, we reject Dr. Adams's unsupported contention that the court's determination of good faith *must* be based on evidence admissible pursuant to the HRE. Such a rule would make little sense. In cases in which a non-settling tortfeasor does not challenge the good faith nature of a settlement, it would be absurd to require the trial court to conduct a hearing according to the HRE. Similarly, if a non-settling tortfeasor challenges a settlement on legal grounds, evidence regarding questions of fact may be unnecessary. If, on the other hand, there appears to be a legitimate factual dispute as to whether a settlement has been given in good faith, a fuller

hearing—including deposition testimony—may be called for. It is important to keep in mind, however, that the good faith of the parties is substantially a function of their states of mind and the circumstances of which they are aware at the time of settlement; what might or might not be proven at trial is relevant only in this context. Accordingly, we conclude that the term "other evidence," as employed in HRS § 663–15.5(c), includes any discovery materials of record, as well as live or deposition testimony. *See Mahathiraj,* 617 N.E.2d at 741–42 ("A court may determine the good faith of a settlement based solely upon the arguments of counsel, based upon affidavits, depositions, and other discovery materials of record, or after conducting an evidentiary hearing.").

Second, we note that Dr. Adams proffered no evidence of collusion, fraud, dishonesty, or other wrongful conduct in the present matter. Dr. Adams's contention that the settlement is collusive because Troyer allegedly failed (1) to disclose to the circuit court evidence pertaining to negligence on the parts of Drs. Bailey and Bellatti and (2) to produce herself or her experts for deposition, notwithstanding the circuit court's order that she do so, is belied by the record. In her petition to determine good faith, Troyer expressly informed the court that she believed that Dr. Bailey had "failed to timely and appropriately evaluate and treat" her injuries, that "Dr. Bellatti's misdiagnosis or delay in diagnosis" concerning her injury had delayed her transfer to QMC, and that "disputes exist[ed] as to both liability and damages[,]" but that she believed that "the vast majority of negligence and malpractice in this matter rest[ed] with [Dr. Adams]." The expert reports discussed *supra* in section I support Troyer's belief. In addition, as noted *supra* in note 7, on April 16, 2002, when Troyer petitioned the circuit court for a good faith determination, she could not have been in violation of the circuit court's order that "[a]ll discovery shall be completed by December 6, 2002." Although Troyer may have agreed to permit the defendants to depose Drs. Yates and Weaver in preparation for *trial,* the fact remains that Troyer would no longer be calling them as trial witnesses by virtue of her settlement with Drs. Bailey and

Bellatti. Thus, any prior agreements or orders pertaining to depositions in preparation for *trial* are unhelpful to Dr. Adams with respect to depositions that he sought to conduct for purposes of the good faith hearing.

Third, it was not an abuse of discretion for the circuit court to deny Dr. Adams the opportunity to depose Drs. Yates and Weaver for purposes of the good faith hearing. Dr. Adams fails to explain how deposing Drs. Yates and Weaver would have yielded information that was not contained in their reports, other than their opinions, if any, regarding the quantification of Drs. Bailey's and Bellatti's *pro rata* shares of liability for Troyer's injuries. But we do not believe that the circuit court committed an abuse of discretion in declining to calculate the settling tortfeasors' *pro rata* shares of liability in the present matter, inasmuch as, based on the state of the record at the time of settlement, their liability for Troyer's injuries was far from certain and the consideration paid by Drs. Bailey and Bellatti was not insignificant. Indeed, in light of Dr. Adams's contention that none of the doctors were negligent, it is difficult to discern how calculating their proportionate liability would have been helpful. As Dr. Bellatti points out, any proportionate share of zero is zero, in which case, as Dr. Bailey notes, the settlements represent a potential windfall to Dr. Adams.

Nor was Dr. Adams denied a reasonable opportunity to establish collusion or tortious conduct by virtue of his inability to depose Drs. Yates and Weaver. The circuit court was aware of Drs. Yates's and Weaver's expert reports concerning Drs. Bailey and Bellatti, and it was reasonable for the circuit court to find that their depositions would merely establish that Troyer had some basis for pursuing her medical malpractice claims against Drs. Bailey and Bellatti. Obviously, the settlement's good faith did not depend on the absence of any basis for Troyer's claims against the settling doctors; otherwise, there could never be a good faith settlement under circumstances in which a plaintiff's claims for relief against joint tortfeasors are not frivolous or otherwise meritless.

In any event, in light of all the information available at the time of the settlement, it was reasonable for Troyer to have concluded that her strongest claim was against Dr. Adams. Put differently, it was reasonable for Troyer to conclude that Drs. Yates's and Weaver's criticisms of Drs. Bailey and Bellatti, *see supra* note 8, were less damning than Dr. Levine's criticism of Dr. Adams, as discussed *supra* in section I.

In sum, the state of the record at the time of settlement is such that the circuit court reasonably concluded that Troyer's settlement with Drs. Bailey and Bellatti was given in good faith. Although Troyer had retained two experts who found fault with the treatment provided by Drs. Bailey and Bellatti, their opinions were: (1) disputed by the expert witnesses of all the defendants, who either controverted the allegation of medical negligence on the parts of Drs. Bailey and Bellatti or opined that Troyer's problems were caused by her initial injury; (2) undermined by the decision of the MCCP, which found no fault on the part of Drs. Bailey and Bellatti and merely "questioned" Dr. Adams's treatment; and (3) at odds with the opinion of another of Troyer's own experts, Dr. Levine, who placed the blame for Troyer's injury squarely on Dr. Adams's treatment of Troyer's foot more than a week after the injury had occurred. Thus, Troyer was reasonable in her position that pursuing her claims against Drs. Bailey and Bellatti would likely be difficult and might even hamper her stronger claim against Dr. Adams. Moreover, the sum paid by Drs. Bailey and Bellatti in settlement—$65,000.00—is not insignificant, and there is no evidence in the present mat-

ter of any collusion or tortious conduct aimed at unfairly injuring Dr. Adams's interests.

### D. Act 300 Does Not Violate A Non–Settling Joint Tortfeasor's Right To Due Process.

Dr. Adams argues that Act 300 violates his right to "procedural" due process, as guaranteed by article 1, section 5 of the Hawai'i Constitution, *see supra* note 2, and the fourteenth amendment to the United States Constitution, *see supra* note 3, because the Act destroys his cross-claims for *pro rata* contribution against the settling co-defendants.[33] Dr. Adams does not, however, cite to any authority that holds either HRS § 663–15.5 or any of the cognate statutes across the nation unconstitutional. He further repeats his contention that the circuit court's good faith determination must be based on "admissible sworn evidence" and that a non-settling tortfeasor must have "access to relevant evidence through discovery" in order to afford the non-settling tortfeasor due process.[34]

Dr. Adams contends (1) that his cross-claims against Drs. Bailey and Bellatti constitute significant property interests, citing *Singer Co. v. Superior Court*, 179 Cal.App.3d 875, 225 Cal.Rptr. 159, 168 (1986), (2) that "there was a severe risk of an erroneous deprivation of [his] contribution right through the defective hearing process,"[35] and (3) that his due process rights outweigh the state's interest in encouraging settlements.

Troyer counters that HRS § 663–15.5 provides the same due process protections as CCPC § 877.6, which a California court up-

---

**33.** In a footnote to his opening brief, Dr. Adams maintains that he is not arguing that "Act 300 creates constitutional deprivations in every case in which it is applie[d,]" but that the Act violated his "procedural and substantive rights" as applied in the present matter. But, inasmuch as HRS § 663–15.5(a)(2) specifically provides for a *pro tanto* reduction in a non-settling tortfeasor's liability, which need not be the *pro rata* reduction that Dr. Adams contends is required to satisfy due process, he would appear, in fact, to be challenging the statute's constitutionality on its face, as well as as applied.

**34.** Dr. Adams also asserts that HRS § 663–15.5 violates his right to a jury trial in a civil case, as

guaranteed by article 1, section 13 of the Hawai'i Constitution, but he does not argue the point other than to speculate that, "[a]s reflected by the settlement figures, Dr. Adams['s] cross[-]claims meet and exceed the [$5,000] claim value threshold" for a civil jury trial. Accordingly, we do not address Dr. Adams's jury trial argument. *See* HRAP Rule 28(b)(4).

**35.** Specifically, he alleges that "[t]here was no admissible evidence against Dr. Adams[,]" "[h]earsay evidence was relied upon, over Dr. Adams'[s] objection[,]" and "Dr. Adams was deprived of ... discovery material [essential] to [the] *Tech–Bilt* factors[.]"

held against a due process challenge in *Erreca's v. Superior Court*, 19 Cal.App.4th 1475, 24 Cal.Rptr.2d 156, 168–69 (1993). Indeed, Troyer points out that, in *Erreca's*, the court held that a good faith settlement hearing adequately protected the due process rights of even an absent non-settling joint tortfeasor, by virtue of "the adverse nature of the settlement negotiations and ... the requirement of court approval of the settlement elements before they may be given full effect." *Id.* at 168.

Dr. Bailey notes that "Dr. Adams will only pay damages to [Troyer] if the jury determines that Dr. Adams and Dr. Adams alone negligently treated [Troyer]." Thus, Dr. Bailey urges that Dr. Adams's due process rights are protected because the latter "faces no risk of having to pay damages in excess of his potential liability" in the absence of a jury trial.

Dr. Bellatti contends that there is no caselaw holding that CATAs that bar cross-claims for contribution by non-settling joint tortfeasors against settling joint tortfeasors are unconstitutional. Moreover, he points out that, in *Singer*, the non-settling joint tortfeasor, who sought to challenge a good faith determination after the fact, was permitted to do so because the party was not a named defendant when the good faith determination was made; the case did not hold that CCPC § 877.6 violated a non-settling defendant's due process rights.

The State of Hawai'i has filed an amicus brief in which it argues that HRS § 663–15.5 satisfies the requirements of due process, *inter alia*, because Dr. Adams has no property interest in his cross-claim for contribution until such time as a jury actually reaches a verdict as to his liability and he *"in fact* pays more than his apportioned share of damages." (Emphasis in original.) The State notes that HRS § 663–15.5 provides for notice and an opportunity to be heard and argues that the trial court should have "wide discretion over what types of evidence to consider" pursuant to HRS § 663–15.5(c), *see supra* note 1, in order to avoid a mini-trial

where possible. Finally, the State points out that, while a *pro tanto* reduction of a non-settling joint tortfeasor's liability favors a plaintiff (who is assured full recovery) over a non-settling tortfeasor (who may pay more than his or her fair share), the *pro rata* reduction urged by Dr. Adams would simply favor a non-settling joint tortfeasor (who *cannot* pay more than his or her fair share, *see Saranillio*, 78 Hawai'i at 18, 889 P.2d at 702 (Levinson, J., concurring)) over a plaintiff (who will not be assured full recovery of his or her damages). "There is no perfect system," the State contends, "of apportioning liability for non-settling joint tortfeasors." [36]

■ "Due process ... is relevant only if liberty or property is deprived." *State v. Bani*, 97 Hawai'i 285, 293, 36 P.3d 1255, 1263 (2002) (quoting *In re Herrick*, 82 Hawai'i 329, 342–43, 922 P.2d 942, 955–56 (1996) (quoting *International Bhd. of Elec. Workers v. Hawaiian Tel. Co.*, 68 Haw. 316, 332, 713 P.2d 943, 956 (1986))) (alteration in original). Thus, this court must decide whether the barring of a cross-claim for contribution pursuant to HRS § 663–15.5 constitutes the deprivation of a protected property interest.

■ As noted *supra*, HRS § 663–12 provides in relevant part that "[t]he right of contribution exists among joint tortfeasors. A joint tortfeasor is not entitled to a money judgment for contribution until the joint tortfeasor has by payment discharged the common liability or has paid more than the joint tortfeasor's *pro rata* share thereof." The right of contribution is entirely a creature of statute; at common law, there was no right of contribution among joint tortfeasors. *Campo v. Taboada*, 68 Haw. 505, 507, 720 P.2d 181, 183 (1986). Hawai'i adopted the 1939 version of the UCATA in 1941, among other reasons, to ameliorate this harsh rule and avoid the injustice of having one joint tortfeasor pay more than his or her fair share of damages. *Id.; Saranillio*, 78 Hawai'i at 9, 889 P.2d at 693; 1941 Haw. Sess. L. Act 24, at 188–90.

---

**36.** The State also argues that Dr. Adams's right to a jury trial has not been violated, but we do not discuss these arguments inasmuch as we have not addressed this point of error. *See supra* note 34.

While this state's appellate courts have never addressed the question whether a right of contribution constitutes a property interest protected by constitutional due process principles, courts from other jurisdictions appear to be in agreement that it is not, unless the right to contribution has accrued, that is, once a tortfeasor has paid more than his or her share of a judgment, pursuant to the relevant CATA, and is otherwise entitled to compensation from joint tortfeasors. *See, e.g., Williams v. White Mountain Const. Co., Inc.,* 749 P.2d 423, 429 (Colo.1988) ("Since no right to contribution had accrued, [there is] no property interest upon which to ground a due process claim."); *Snoddy v. Teepak, Inc.,* 198 Ill.App.3d 966, 145 Ill.Dec. 64, 556 N.E.2d 682, 685 (1990) ("The protections of the fourteenth amendment apply to accrued causes of actions, but do not apply to unaccrued causes of actions. While it is true that contribution among joint tortfeasors is an *inchoate* right at the time of the injury, the cause of action does not *accrue* until a tortfeasor pays more than his *pro rata* share." (Citations omitted.)); *see also Silver v. Silver,* 280 U.S. 117, 122, 50 S.Ct. 57, 74 L.Ed. 221 (1929) ("Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object."); *West v. Rollhaven Skating Arena,* 105 Mich.App. 100, 306 N.W.2d 408, 410 (1981) ("It is logical to assume that joint tortfeasor[s] will be more likely to enter into settlement negotiations with a plaintiff if they know they will not be entitled to contribution if the other tortfeasor settles and they do not. Since this state of facts reasonably supports the legislation's objective, it cannot be said to violate due process."); *National Mut. Ins. Co. v. Whitmer,* 70 Ohio St.2d 149, 435 N.E.2d 1121, 1123 (1982) ("[T]he right to contribution is inchoate from the time of the creation of the relationship giving rise to the common burden until the payment by a co-obligor of more than his proportional share, and ... the right becomes complete and enforceable only upon a payment by the claimant extinguishing the whole of the common obligation[.]"); *Scovell v. TRK Trans, Inc.,* 299 Or. 679, 705 P.2d 1144, 1148 (1985) (" 'The *right to contribution* is inchoate from the date of the creation of the relation between the parties, but *is not complete,* so as to be enforceable, until there has been an actual payment, in whole or in part, of the common obligation, or *until something is done equivalent to a discharge* thereof.' " (Emphases in original.)); *Nelson v. Ptaszek,* 505 A.2d 1141, 1143 (R.I.1986) ("[A] joint tortfeasor is not entitled to a final money judgment until he or she has discharged the common liability or has paid more than his or her *pro-rata* share. However, until such time, the right to contribution is inchoate."); *Smith,* 429 S.E.2d at 648 ("A defendant in a civil action has a right in advance of judgment to join a joint tortfeasor based on a cause of action for contribution. This is termed an 'inchoate right to contribution' in order to distinguish it from the statutory right of contribution after a joint judgment...."). *But see Singer,* 225 Cal.Rptr. at 168 ("Since a nonsettling tortfeasor loses his right to seek contribution or partial indemnity from a joint tortfeasor who settled *if* that settlement is adjudged to be in good faith, the nonsettling tortfeasor stands to be deprived of his property right to contribution or partial indemnity.").

Assuming *arguendo* that an unaccrued right of contribution constitutes a property interest protected by the due process clause of either the United States or Hawai'i Constitutions, it is nevertheless undisputed that HRS § 663–15.5(b) and (c), *see supra* note 1, afford a non-settling joint tortfeasor notice and an opportunity to be heard regarding the determination whether a settlement has been given in good faith and; consequently, bars cross-claims for contribution against the settling joint tortfeasor. As noted above, Dr. Adams contends that the trial court's determination of good faith must be based on evidence admissible pursuant to the HRE in order to satisfy the imperatives of due process, but he does not cite any caselaw in support of his proposition, and we are unaware of any. Moreover, this court has held that:

> [d]ue process is not a fixed concept requiring a specific procedural course in every situation. *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu,* 70 Haw. 361, 378,

773 P.2d 250, 261 (1989); *cf. Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 ... (1961). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 ... (1972). The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *see also Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 ... (1976); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 605–06, 95 S.Ct. 719, 42 L.Ed.2d 751 ... (1975). [*Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 388, 984 P.2d 1198, 1214 (1999) ] (quoting *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 243, 953 P.2d 1315, 1341 (1998) (citations omitted)) (brackets and ellipsis points in original).

*Fujimoto v. Au*, 95 Hawai'i 116, 164, 19 P.3d 699, 747 (2001).

HRS § 663–15.5(b) provides the court with the means of conducting the good faith hearing in a "meaningful manner" and, as discussed *supra* in section III.C., we believe that the circuit court did not abuse its discretion in conducting the hearing in the present matter as it did. Accordingly, we hold that HRS § 663–15.5 adequately protects a non-settling joint tortfeasor's right to procedural due process and, therefore, that Dr. Adams's rights to procedural (as well as substantive) due process were not violated.

## IV. CONCLUSION

In sum, we hold that: (1) the question whether a settlement is given in good faith for purposes of HRS § 663–15.5 is a matter left to the discretion of the trial court in light of all the relevant circumstances extant at the time of settlement; (2) the trial court's determination of good faith is reviewed for abuse of discretion; (3) Act 300 applies to Troyer's claims of medical malpractice; (4) Act 300 does not violate Dr. Adams's right to due process of law; and (5) the circuit court did not abuse its discretion or violate Dr. Adams's right to due process of law in determining that Troyer's settlement with Drs. Bailey and Bellatti was given in good faith. Accordingly, we affirm the order of the third circuit court, filed on June 5, 2002, granting Troyer's petition for issuance of an order determining that her settlement was given in good faith.

Dissenting Opinion of ACOBA, J.

I respectfully dissent because (1) the Hawai'i State Legislature clearly intended that Hawai'i follow California law and thus adopt the governing factors listed in *Tech-Bilt, Inc. v. Woodward–Clyde & Assoc.*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985), in applying Act 300 (codified as Hawai'i Revised Statutes (HRS) § 663–15.5) rather than the totality of the circumstances test fashioned by the majority, and (2) the amorphous nature of the majority's totality of circumstances test invites due process violations and fails to adequately protect the rights of all parties involved.

## I.

In enacting Act 300, the Hawai'i Legislature sought to "establish[ ] a good faith settlement procedure for joint tortfeasors and co-obligors." Sen. Stand. Comm. Rep. No. 828, in 2001 Senate Journal, at 1253. In doing so the legislature plainly intended that Hawai'i apply California case law in implementing the Act. Act 300 is expressly modeled after California Code of Civil Procedure §§ 887 & 887.6. The legislature declared that the "procedures proposed by the measure are *based on a system that has been in existence in California* for over ten years." Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599 (emphasis added). Whereas Act 300 was expressly "based" on the California "system" it would appear indisputable that the legislature meant that our courts should essentially adhere to the body of law and judicial standards aggregated over the sixteen years the California statute has

been in existence. In this context, it can be reasonably assumed the legislature was familiar with litigation surrounding the California statute, and the case law that subsequently evolved. *See Cowan v. First Ins. Co. of Haw.*, 61 Haw. 644, 649 n. 4, 608 P.2d 394, 399 n. 4 (1980) (holding that it is a well-settled rule that the adoption of another state's statute encompasses that state's judicial construction of the statute unless a contrary intent appears).

Despite any concerns that followed in the wake of the *Tech–Bilt* standards, the legislature did not voice similar objections in passing Act 300. The legislature had the opportunity to draft Act 300 in response to such matters, but obviously chose not to do so. In light of this history, it is incumbent on this court to apply Act 300 as intended by the legislature. *See Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 483, 6 P.3d 349, 355 (2000) (holding that when the Supreme Court construes a statute, its foremost obligation is to ascertain and give effect to the intention of the legislature), *Gorospe v. Matsui*, 72 Haw. 377, 379–380, 819 P.2d 80, 81 (1991) (holding that the court's primary duty is to ascertain and give effect to the intention of the legislature).

The majority asserts that Hawai'i should not follow California case law because the interpretation of the model rule from which the California statute is derived was misread. *See* majority opinion at 424–426, 77 P.3d at 108–110. The criticism of that interpretation was presented in Chief Justice Bird's dissent to *Tech-Bilt* and in subsequent cases in other jurisdictions. Again, it may reasonably be presumed that the Hawai'i Legislature was aware of these criticisms when it chose to adopt the "system that has been in existence in California." Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599. *See Cowan*, 61 Haw. at 649 n. 4, 608 P.2d at 399 n. 4. Therefore, inasmuch as the arguments cited by the majority have been presented and rejected in the California case law, there is no rational basis for inferring that the legislature's position would have been otherwise.

Moreover, when a law has been adopted from another jurisdiction we have generally found the decisions of the courts in that jurisdiction persuasive in construing and applying our analogous law. *See, e.g., Territory v. Ota*, 36 Haw. 80, 97–98 (1942) (holding that the adoption of a statute from another jurisdiction after said statute has been construed carries with it the construction placed upon it by the courts of the jurisdiction from which it is borrowed unless the imported construction is out of harmony with the spirit and policy of general legislation of the home State); *S. Utsunomiya Enter. v. Moomuku*, 75 Haw. 480, 505, 866 P.2d 951, 964, (1994) (holding that California courts' interpretation of California's lis pendens statutes are particularly relevant in interpreting Hawai'i's statute, in light of similarity between statutes); *Gold v. Harrison*, 88 Hawai'i 94, 105, 962 P.2d 353, 364 (1998) (holding that "[w]here we have patterned a rule of procedure after an equivalent rule within the [Federal Rules of Civil Procedure], interpretations of the rule by the federal courts are deemed to be highly persuasive in the reasoning of this court"); *Schefke v. Reliable Collection Agency*, 96 Hawai'i 408, 425, 32 P.3d 52, 69 (2001) (construing Hawai'i discrimination statute in light of interpretations by the federal courts of analogous federal laws for guidance). Under the circumstances of this case, there is no principled reason for departing from that approach.

## II.

The standards developed under California law provide a definitive basis for effectuating the requirement of "good faith" in Act 300. In *Tech-Bilt*, the California Supreme Court established the procedure for satisfying the rather abstract notion of a "good faith" settlement as required under the statute. It was said that the "intent and policies" that underlie the good faith settlement provision are "first, equitable sharing of costs among the parties at fault, and second, encouragement of settlements." *Tech-Bilt*, 213 Cal. Rptr. 256, 698 P.2d at 166. The *Tech-Bilt* court stated that "the intent and policies underlying section 877.6 [good faith settlement provision] require that a number of factors be taken into account" and enumerat-

ed those factors.[1] *Id.* It was observed that a "primary concern" was that "[i]n the great majority of cases ... equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 163 (citations omitted). On the other hand, requiring a proportionate liability assessment would also encourage settlement because "the settling defendant is induced to offer more in order to bring the settlement within the bounds of fairness, [thus] the plaintiff's incentive to settle may be greater." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 167. By setting forth the discrete factors germane to a good faith evaluation, *Tech-Bilt* informs parties, counsel and trial courts of those facts pertinent in an Act 300 hearing on good faith.

On the other hand, jurisdictions adopting the totality of the circumstances test expressly announce that they will not follow the *Tech-Bilt* proportionate liability test. Whereas *Tech-Bilt* emphasized that there could not be a good faith settlement in the absence of a judicial determination of the proportionate liability of the settling joint tortfeasor, the totality of the circumstances test rejects this view. *See Mahathiraj v. Columbia Gas of Ohio, Inc.,* 84 Ohio App.3d 554, 617 N.E.2d 737, 741 (1992) (refusing to adopt *Tech-Bilt* requirement and instead holding that "[w]hile courts are free to consider the amount of a proposed settlement in comparison to the amount the party would likely be responsible for at trial, the comparison is only one of many factors that a court weighs in its totality of the circumstances analysis"); *Smith v. Texaco,* 232 Ill. App.3d 463, 173 Ill.Dec. 776, 597 N.E.2d 750, 756 (1992) (rejecting the argument that there cannot be a determination of good faith unless there is a showing of the relative liabilities of the parties and refusing to

place emphasis on any one factor as being determinative of good faith); *Smith v. Monongahela Power Co.,* 189 W.Va. 237, 429 S.E.2d 643, 652 (1993) (holding that good faith is determined by several factors—the focus is not whether the settlement fell within a "reasonable range" of the settling tortfeasors's proportional share of liability, but whether the circumstances indicate corrupt behavior on the part of the settling tortfeasor).

In a similar vein, the totality of the circumstances test that the majority adopts is an amorphous one in which the list of factors to consider "is not exclusive." Majority opinion at 77 P.3d at 111. Allowing the trial courts to consider *"any other factor* that is relevant to whether a settlement has been given in good faith[,]" leaves the term "good faith" without any discernable boundaries. Majority opinion at 77 P.3d at 111 (emphasis added). For example, in the majority view, proportionate liability is only one of many factors that may be considered. Since a judicial determination of this factor is not required there is no assurance that an appropriate apportionment of fault will be achieved in the settlement.

Without the guidance the *Tech-Bilt* factors provide, parties and counsel will be unsure of the type of information necessary to establish a good faith claim. Trial courts will be uncertain of what evaluative factors should be dispositive. The undifferentiated approach inherent in the majority test would fail to ensure a focused record for appellate review. The ultimate result of such an approach will engender disparate results among the cases.

### III.

In failing to require that the parties and the courts arrive at a reasonable apportion-

---

1. In this inquiry, *Tech-Bilt* requires that the trial court must determine the following:
 1. A rough approximation of plaintiff's total recovery and the settlor's proportionate liability.
 2. The amount paid in settlement.
 3. The allocation of settlement proceeds among plaintiffs, with the recognition that a settlor should pay less in settlement than he would if he were found liable after trial.
 4. The financial condition and insurance policy limits of settling defendants.

 5. The existence of collusion, fraud, or tortious conduct aimed to injure the interest of the settling defendant.
 6. Whether, on the basis of information available at the time of settlement, the settlement is not grossly disproportionate to what a reasonable person, at the time of the settlement would estimate the settling defendant's liability to be. *Tech-Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 166–167.

ment of liability before settlement is approved, the majority's good faith test, in effect, invites unjust results. Under HRS 663–15.5(a)(3) a settling party is discharged from all liability for any contribution to any other party. HRS 663–15.5(d) bars a non-settling party from asserting claims against a settling party at the subsequent trial. HRS 663–15.5(a)(2) (Supp.2002) provides that the recovery against a nonsettling defendant is only diminished by "the amount stipulated by the release, dismissal, or covenant, or in the amount of the consideration paid for it, whichever is greater[.]" The fact finder at trial will not be apprised of any contribution by the settling joint tortfeasor. Thus, the risk is great that unless a meaningful attempt is made to arrive at a reasonable apportionment of the settling joint tortfeasors's liability prior to trial, the nonsettling defendant will be required after trial to pay more than an appropriate proportionate share of the damages owing to the plaintiff.

By contrast, the California courts have recognized that "the goals of equitable sharing and encouragement of settlements are not always necessarily harmonious. If the policy of encouraging settlements is permitted to overwhelm equitable financial sharing, the possibilities of unfair tactics are multiplied. *Neither statutory goal should be applied to defeat the other." Tech-Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 163 (emphasis added). The *Tech-Bilt* factors accomplish both goals of equitable sharing and encouragement of settlement.

The net result of the majority test is to encourage settlements to the detriment of equitable financial sharing. As stated by the *Tech-Bilt* court, "encouragement of settlements and the equitable allocation of costs among multiple tortfeasors ... would be disserved by an approach which emphasizes one to the virtual exclusion of the other." *Id.* 213 Cal.Rptr. 256, 698 P.2d at 166. The majority's test is such an approach, contrary to the legislature's intent of protecting the rights of all parties to the settlement. The legislature has declared that Act 300 "will achieve its stated purpose while still adequately protecting the rights of *all parties involved.*" Sen. Stand. Comm. Rep. No. 828, in 2001 Senate

Journal, at 1253 (emphasis added). Hence, a determination of proportionate liability among the joint tortfeasors is crucial to ensuring that the rights of all parties are protected. The only remedy for such a digression would be to amend the statute.

## IV.

Procedural due process rights are violated when (1) a particular interest which a claimant seeks to protect is "property" within the meaning of the due process clauses of the federal or state constitutions, and (2) those property interest are not adequately protected by specific procedures. *See Sandy Beach Defense Fund v. City Counsel of Hono.,* 70 Haw. 361, 376, 773 P.2d 250, 260 (1989). Once it is determined that a valid property interest is at stake, it must be determined whether proper procedural due process was afforded the claimant. *See id.* The basic elements of procedural due process require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of the property interest. *Id.* at 378, 773 P.2d at 261.

In construing the analogue of Act 300, California courts have held that a cross-claim for contribution asserted by one joint tortfeasor against another constitutes a property interest protected by due process although the right of contribution has not yet accrued. In *Singer Co. v. Superior Court,* a nonsettling co-defendant (not a party at the time of settlement) was denied contribution from a settling co-defendant after a good faith determination was rendered. 179 Cal.App.3d 875, 225 Cal.Rptr. 159, 161 (1986). The California Court of Appeals, Fifth District interpreted Section 877 of the California Code of Civil Procedure, the same section upon which Act 300 is based. *See id.* at 161. *Singer* held that under the California statute, "[s]ince a nonsettling tortfeasor loses his right to seek contribution or partial indemnity from a joint tortfeasor who settled if that settlement is adjudged to be in good faith, the *nonsettling tortfeasor stands to be deprived of his property right to contribution or partial indemnity." Id.* at 168 (emphasis

added). As Act 300 is based on the California statute, the *Singer* holding is instructive.[2]

The majority holds that assuming an unaccrued right of contribution constitutes a property interest protected by due process, the procedures requiring a good faith hearing provided for in HRS § 663–15.5(b) and (c) afford a nonsettling joint tortfeasor adequate notice and opportunity to be heard. Majority opinion at 77 P.3d at 116. On the contrary, the majority's totality of circumstances test as it implements the good faith standard does not compel the courts to engage in the inquiry necessary to determine whether the amount contributed by the settling defendant is fairly related to its proportional liability. But in the framework of Act 300, the right to contribution is a property interest protected by the due process clause. Thus, the majority's totality test fails to ensure that the nonsettling joint tortfeasor's right to due process is protected. Consequently, a nonsettling defendant is deprived of the opportunity to be heard at a meaningful time and in a meaningful manner.

## V.

Based on the foregoing, I would vacate the June 5, 2002 order, granting petition of Plaintiff–Appellee Jennifer L. Troyer, formerly known as Jennifer L. Decker (Plaintiff), and determining that her settlement was made in good faith and remand to the court for application of the *Tech-Bilt* factors. I would order that Defendant–Appellant Carl W. Adams, M.D. (Defendant) be permitted to depose Plaintiff's expert witnesses with respect to their opinions concerning the liability of the settling defendants (John Bellatti, M.D. and Patricia Bailey, M.D.). *See Singer*,

225 Cal.Rptr. at 172 (holding that depositions of experts after the settlement were required to be made available to a defendant contesting the settlement because evidence available at the time of settlement is not only what the settling parties actually contemplated or actually presented to the court in seeking good faith determination; available evidence also encompasses what the parties should have known).

Because the purpose of the depositions would be to ascertain the "good faith" of the settlement proposal, and inasmuch as HRS 663–15.5(b) places the burden on the nonsettling party to demonstrate a lack of good faith, Defendant is entitled to discover the basis on which the settlement was reached. *See Erreca's v. Superior Ct.*, 19 Cal.App.4th 1475, 24 Cal.Rptr.2d 156, 167 (1993) ("settling parties have the most knowledge of the value of the various claims they are attempting to settle and can best allocate settlement proceeds among those various claims, subject to court approval"); *Abbott Ford, Inc. v. Superior Ct.*, 43 Cal.3d 858, 239 Cal.Rptr. 626, 741 P.2d 124, 138 n. 22 (1987) (holding that because a nonsettling defendant may challenge the settlement amount, it is appropriate to place the burden of assigning value of consideration on the parties to the agreement who have particular knowledge of the facts).

Such discovery would be limited to information relevant to the good faith evaluation and available at the time of settlement. *Tech-Bilt*, 213 Cal.Rptr. 256, 698 P.2d at 167 (holding that good faith "evaluation be made on the basis of information available at the time of settlement"). Because the purpose of the depositions would be to ascertain the good faith of the settlement proposal, I would limit the use of the depositions to the good

2. Because the Hawai'i Legislature explicitly stated that Act 300 was modeled after the California statute, case law interpreting other state statues is not instructive. Although other cases hold that the joint tortfeasors' right to contribution is not a property right protected under the Due Process Clause, these cases interpret other joint tortfeasor statutes. *See Snoddy v. Teepak, Inc.*, 198 Ill.App.3d 966, 145 Ill.Dec. 64, 556 N.E.2d 682 (1990) (interpreting the Uniform Among Joint Tortfeasor Act (Ill.Rev.Stat.1987, ch. 70, par 301 et seq.)); *West v. Rollhaven Skating Arena*, 105 Mich.App. 100, 306 N.W.2d 408 (1981) (interpreting Michigan Statute (M.C.L.

§ 600.2925(d)(c)); MSA § 27A.2925(4)(e)); *National Mut. Ins. Co. v. Whitmer*, 70 Ohio St.2d 149, 435 N.E.2d 1121 (1982) (interpreting Ohio Contribution Among Tortfeasors Act); *Scovell v. TRK Trans, Inc.*, 299 Or. 679, 705 P.2d 1144, 1145 (1985) (interpreting Oregon statute which states that settling party is not entitled to contribution); *Nelson v. Ptaszek*, 505 A.2d 1141, 1143 (R.I.1986) (interpreting release agreement, not a joint tortfeasor statute); *Monongahela*, 429 S.E.2d at 648 (extending a West Virginia statute barring contribution by settling defendants to include non-party joint tortfeasors).

faith hearing. *See Singer*, 225 Cal.Rptr. at 172 (holding that party is obligated to turn over evidence which is relevant to the good faith hearing, but subsequent discovery or trial after settlement is not relevant to the "good faith" of the settlement). Moreover, parties have an obligation to obtain their own experts for trial.

In consonance with precedent under the California analogue, Plaintiff must at the hearing on the issue of good faith "explain to the court and to all other parties, by declaration or other written form, the evidentiary basis for any allocations and valuations made, and ... demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached." *Erreca's*, 24 Cal. Rptr.2d at 170. As the nonsettling defendant also has a burden of proof, Defendant should be permitted to demonstrate that the settlement is disproportionate to what the settling defendants' liability should be. *Tech-Bilt*, 213 Cal.Rptr. 256, 698 P.2d at 167 (holding the party asserting the lack of good faith has to burden of proof on that issue and should be permitted to demonstrate that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute).

## VI.

Definitive standards are imperative in the administration of the judicial system. The legislature manifestly intended that the factors set out in *Tech-Bilt* be applied in implementing the good faith provision in Act 300. Such factors would afford the parties, attorneys, and trial courts the guidance required to ensure a fair apportionment of liability in settlement and an efficient adjudication of settlement matters. Therefore, I believe the *Tech-Bilt* factors should control in HRS § 663–15.5 hearings on good faith settlement.